STATE of Minnesota, Respondent,

v.

Kevin James MOORE, Appellant.

No. C3-88-723.

Supreme Court of Minnesota.

March 31, 1989.

C. Paul Jones, Steven P. Russet, Asst. State Public Defenders, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Tom Foley, Ramsey County Atty., Darrel C. Hill, St. Paul, for respondent.

KEITH, Justice.

Appellant Kevin James Moore appeals his jury conviction of first and second degree murder, Minn.Stat. §§ 609.185, 609.19 (1986). He was sentenced to life imprisonment at the Minnesota Correctional Facility at Oak Park Heights on the first degree murder conviction. On appeal, he claims reversible error because: (1) the prosecutor failed to present exculpatory evidence to the grand jury; (2) the trial court did not

suppress evidence seized under an invalid search warrant or alternatively should have required the state to reveal the identity of a confidential informant; (3) the prosecutor used a peremptory challenge to strike the only black person from the jury panel; (4) the evidence was insufficient to convict him; and (5) the jury verdicts finding him guilty of both first and second degree murder are legally inconsisent. We affirm.

Appellant was convicted by a jury for the murder of 18–year–old Lynn Ferguson during the early morning hours of August 26, 1987, in a car parked in an alley near University Avenue in St. Paul. The state presented the testimony of two eyewitnesses, William Johnson and John Edmondson. Both testified that appellant fired four shots from a handgun, with two shots striking Ferguson in the head and killing her instantly. Edmondson and Johnson, both minors, were passengers in the car when the murder occurred. The state's theory of appellant's motive was that he was protecting Edmondson because Ferguson was "setting him up" to be attacked or killed by the members of a street gang known as the L.A. Crypts. The night before the shooting, Ferguson was seen with two members of this street gang and the two had threatened Edmondson.

On the night of the murder, Lynn Ferguson gave a ride in her car to appellant and William Johnson. In her car, appellant said that the L.A. Crypts were going to attack Edmondson, but that appellant would get them. Later in the evening Edmondson joined the group in Ferguson's car. Appellant directed Ferguson to drive to an address on Hague Avenue in St. Paul. Johnson testified that appellant got out of the car and approached a building, then returned several minutes later. He had a gun under his belt. The inference was that he was looking for members of the L.A. Crypts.

Appellant, still sitting in the back seat directly behind Ferguson, later directed her to drive to the home of another relative, to get him and another person to go along to "jump on" some members of the L.A.

Crypts. Appellant eventually gave directions to Ferguson to drive down an alley and then to stop. Johnson testified that he looked over at Ferguson and saw appellant with a black revolver in his hand pointing at Ferguson's head. He saw appellant shoot her, firing four shots. Edmondson said he was looking out the side window when he heard four shots. Appellant then leaned forward over Ferguson, and using his right hand, put the car in "Park" gear because it was rolling forward. Edmondson saw the gun in his left hand. Appellant was wearing a blue sweat shirt, and on the radio, or stereo, a song called "Lovers" was playing. Appellant then got out of the two-door sedan through the driver's door and ran down the alley. Johnson and Edmondson left the car through the other door and ran down the alley in the opposite direction. They walked back to a relative's house, where they had been earlier, and they again met appellant, who was already there talking to members of the household. He was telling those present that he wasn't going to let anyone else in his family get hurt.

Later, Edmondson, Johnson and appellant returned to an apartment on North Oxford, where they all had recently been living with Edmondson's sister, Faye Myers. She spoke with the three when they arrived. According to Myers, appellant told her later that night that he had killed Lynn Ferguson by shooting her in the head. Appellant also told William Johnson that Lynn Ferguson was setting up Edmondson and that he did not want anyone else in his family to be hurt. The next day appellant gave Edmondson a similar explanation, stating the L.A. Crypts were out to kill Edmondson. Appellant left the apartment the night of the shooting, returning later in the morning. He was singing the song "Lovers" as he left, the same song that was playing during the murder.

A neighbor along the alley where Lynn Ferguson was shot told the police the next day that she heard four gunshots at about 2:30 a.m. on August 26. Another neighbor saw Ferguson's car in the alley, with the motor running, the lights on and the doors

open at 3:10 a.m. The police arrived at 6:10 a.m. and found Lynn Ferguson's body slumped in the driver's seat. She had two bullet holes in the back of her head. The medical examiner testified that two bullets entered her brain, and two shots missed her. The first shot to hit her probably rendered her unconscious, and the second hit killed her instantly. The shots came from the back seat and were fired from 18–24 inches away, although possibly as close as 12 inches. Hair strands taken from the car matched samples taken from William Johnson, Edmondson, and appellant. One of these strands, consistent with appellant's hair, was found in the back seat of the car. No fingerprints from appellant were found in the car. There was a smudge found on the bottom of the gearshift lever. The police also found a cassette tape in the car containing the song "Lovers."

Two St. Paul police officers interviewed John Edmondson in St. Louis where he had returned to live. After initially denying any knowledge of the murder and giving false information, he implicated appellant. However, he concealed the fact his friend, William Johnson, was also present. On September 1, appellant was arrested without incident at the house on Central Avenue. Search warrants for that house and for Faye Myers' apartment were executed for the stated purpose of finding the gun, writings and documents which would implicate appellant. The gun was never recovered, but at Myers' apartment the search produced a blue sweat shirt with blood stains. At trial Myers identified the blue sweat shirt as belonging to appellant, although she had earlier denied that the sweat shirt was his. She said that she did so out of loyalty to appellant, who was her closest cousin, closer in fact than her brother, John Edmondson. An analysis of the blood on the sweat shirt indicated that it was from Lynn Ferguson. The pattern of the blood stain on the shirt was consistent with the shirt coming into contact with a bloody object, rather than from blood spattering. The jury, after deliberating for 3 days, returned guilty verdicts for first degree and second degree murder.

1. Appellant claims that his conviction should be reversed because the prosecutor failed to present exculpatory evidence to the grand jury which indicted him. *See* 1 ABA Standards for Criminal Justice § 3–3.6(b) (1979), ("No prosecutor should knowingly fail to disclose to the grand jury evidence which will tend to substantially negate guilt."); *State v. Olkon*, 299 N.W. 2d 89, 105–106 (Minn.1980) *cert denied* 449 U.S. 1132, 101 S.Ct. 954, 67 L.Ed.2d 119 (1981). The claimed exculpatory evidence consists of prior statements made by the state's two prime witnesses that were somewhat inconsistent with their testimony before the grand jury. Specifically, when John Edmondson was initially questioned by the police on August 29, he denied any involvement in the murder. He also stated that another individual or gang might be responsible for the murder. During the same interview with the police, Edmondson later admitted that he was present during the murder, as was appellant, and that appellant murdered Ferguson. In testimony before the grand jury he said that another person, William Johnson, had also been present at the murder. His prior statements were not mentioned to the grand jury. Likewise, William Johnson had earlier told police that he was not present during the murder and this information was not told to the grand jury when Johnson testified. The trial court denied the motion to dismiss the indictment, stating that had the prior statements been disclosed to the grand jury, it would not have changed the indictment.

A grand jury proceeding is not a trial on the merits, and jurors do not determine guilt or innocence, but determine if there is probable cause to believe the accused has committed the crime. *State v. Inthavong*, 402 N.W.2d 799, 801 (Minn. 1987). A presumption of regularity attaches to the indictment and it is a rare case where an indictment will be invalidated. *Id.* Because of this presumption, a criminal defendant bears a heavy burden when seeking to overturn an indictment. *State v. Scruggs*, 421 N.W.2d 707, 717 (Minn.1988). Although we do not believe

the unpresented evidence was exculpatory, assuming that it was, the failure to produce the evidence "will not require reversal unless it would have materially affected the [grand jury] proceeding." *Olkon,* 299 N.W.2d at 106. The effect on the grand jury proceedings must be judged after looking at all of the evidence that the grand jury did receive. *See Id.* In *Olkon,* we concluded that the strong evidence supporting the finding of probable cause negated the exculpatory effect of the omitted evidence and, therefore, the omitted evidence would not have affected the outcome of the proceeding. *See Id.*

▆ In this case it is unlikely that the omitted evidence, which tends to discredit the witnesses, would change the grand jury's indictment. Any error appears harmless when viewed alongside their testimony implicating the defendant and describing the details of the crime. *See* Minn.R.Crim.P. 31.01.[1] We therefore reject appellant's claim.

2. Appellant next argues that the trial court should not have allowed in evidence a sweat shirt seized by the police under a search warrant. The affidavit by Sgt. Johnson accompanying the search warrant application indicated that a "witness" identified appellant as the person who shot the victim.[2] In fact, that information did not come from an eyewitness, but from a police informant. Other alleged misrepresentations in the affidavit include Sgt. Johnson's failure to date the information, implying that it was fresh information when in reality it was learned on August 28, more than 3 days before the search warrant application on September 1.

▆ A search warrant is void, and the fruits of the search must be excluded, if the application includes intentional or reckless misrepresentations of fact material to the findings of probable cause. *See Franks v. Delaware,* 438 U.S. 154, 171–172, 98 S.Ct. 2674, 2684–2685, 57 L.Ed.2d 667 (1978); *State v. Causey,* 257 N.W.2d 288, 292 (Minn.1977). A misrepresentation is "material" if when set aside there is no longer probable cause to issue the search warrant. If so, then the court must determine that the police deliberately or recklessly misrepresented facts, because innocent or negligent misrepresentations will not invalidate a warrant. *Causey,* 257 N.W.2d at 292.

▆ Although the affidavit's characterization of the police informant as a "witness" may be misleading, since a citizen witness' first-hand observations of a crime may be entitled to greater weight than an ordinary police informant's tip based on hearsay, *Illinois v. Gates,* 462 U.S. 213, 234, 103 S.Ct. 2317, 2330, 76 L.Ed.2d 527 (1983) (dicta); *see State v. Wiley,* 366 N.W. 2d 265, 269 (Minn.1985); 1 W. LaFave, *Search and Seizure* § 3.4(a) (2 ed.1986), we need not decide if there was a material misrepresentation made in this case. It is clear from the record that any alleged misrepresentation was a result of negligence on the part of the police officer, rather than recklessness or an intent to deceive the magistrate. *State v. Causey,* 257 N.W. 2d at 292. The record indicates that Sgt.

---

1. *See also, Bank of Nova Scotia v. United States,* — U.S. —, 108 S.Ct. 2369, 2374, 101 L.Ed.2d 228 (1988) (dismissal of the indictment by the trial court for nonconstitutional error is appropriate " 'if it is established that the violation substantially influenced the grand jury's decision to indict,' or there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." ).

2. The relevant portion of the affidavit provides: During the course of the investigation information was developed [from] a witness that the person who did the shotting (sic) of Ferguson was Kevin James Moore. The witness knew the details of the crime, the type of gun that was used and the location of the wounds.

The witness further stated that Moore retained possession of the .38 caliber revolver used to shot (sic) Ferguson.

Attempts to locate Kevin James Moore were negative and information was received that Moore had fled to an unknown location in Minneapolis. Information was learned that Moore was to return to St. Paul this evening to get his belongings from the two above addresses before fleeing the state.

The Affiant seeks a warrant to search both 545 West Central and 81 North Oxford, apt. 18 for the person of Kevin James Moore and to search for the .38 caliber revolver used in this crime and any writings or documents which demonstrate participation in this crime.

Johnson has been with the police force for 23½ years. He testified that he has prepared only four or five search warrant applications in his career. He testified that he acted in good faith and it also appears that Sgt. Johnson could have included information in the affidavit which would have corroborated the informant's tip—namely, the fact that John Edmondson, an actual witness to the crime, had also named appellant as the murderer of Ferguson. There are no facts in this record to conclude that Sgt. Johnson deliberately misrepresented facts in his affidavit. The evidence seized during the search need not have been suppressed. Because of our holding, we need not reach the issues of whether appellant had standing to challenge the search of the apartment and seizure of the sweat shirt or whether the admission of that evidence would be harmless error even if it was illegally seized.

▮ The trial court also refused to require a disclosure of the identity of the state's informant, holding that there were no material misrepresentations in the supporting affidavit which would require disclosure. In rare cases a criminal defendant's interest in learning the identity of a police informant outweighs the state's privilege not to disclose the identity. A defendant seeking to learn the identity of an informant may argue that the informant's identity is needed to establish that the police committed perjury in obtaining a search warrant or that the informant's identity is needed because the informant was a material witness and may provide testimony that will be helpful to the defendant. *See State v. Ford*, 322 N.W.2d 611, 614 (Minn.1982); *Syrovatka v. State*, 278 N.W.2d 558, 561–562 (Minn.1979); *State v. Luciow*, 308 Minn. 6, 13–14, 240 N.W.2d 833, 839 (1976). These cases draw a distinction between the defendant's ultimate burden of establishing the need for disclosure and the defendant's lesser burden of establishing a basis for inquiry by the court in an in camera hearing. Disclosure of an informant's identity in order to establish police perjury or recklessnes in obtaining a search warrant is permitted when the defendant has sufficiently challenged the

veracity of the affidavit of the applicant for the search warrant and disclosure is necessary to complete the evidentiary attack on the affidavit. *Luciow*, 308 Minn. at 13–14, 240 N.W.2d at 839. Disclosure then depends on the court's weighing of competing interests: the defendant's interest in a fair assessment of probable cause free of police perjury or recklessness and the state's interest in protecting the anonymity of informants. *Id.* The defendant has the burden of establishing the need for disclosure of the informant's identity. *Ford*, 322 N.W. 2d at 614. A lesser showing by the defendant is needed to justify an in camera inquiry by the court, outside the presence of the defendant and his counsel, at which the court considers the affidavits or interviews the informant personally. All that is needed to justify an in camera inquiry is a minimal showing of a basis for inquiry but something more than mere speculation by the defendant that examination of the informant might be helpful. *See Syrovatka*, 278 N.W.2d at 562; 1 LaFave, Search and Seizure § 3.3(g) at 711 ("[I]t should not take much to prompt the * * * judge to order such a hearing").

▮ In this case it is clear from the record made at the omnibus hearing that the police were neither reckless nor committed perjury in obtaining the search warrant. Any misrepresentation in the affidavit was the result of negligent use of words on the part of an officer inexperienced in drafting warrant applications. The only reason for disclosing the identity of the informant would have been to allow defense counsel to conduct a fishing expedition in the hope of discovering other possible misrepresentations on which to attack probable cause for the warrant. This would have been futile, however, since the record of the omnibus hearing establishes that the warrant was supported by probable cause despite any misrepresentations in the search warrant application. The informant's information was reliable and was corroborated by information supplied by an eyewitness to the crime, John Edmondson, and by other evidence. Bearing in mind that the nature of the crime required a

heightened concern for the protection of the state's informant, the state's interest outweigh the defendant's interest and thus the trial court did not err in denying the motion to disclose the informant's identity.

■ 3. Appellant also contends that he was denied a fair trial because of the state's racially discriminatory use of a peremptory challenge to exclude the one black person from the panel of 60 potential jurors. In *Batson v. Kentucky*, 476 U.S. 79, 84, 106 S.Ct. 1712, 1716, 90 L.Ed.2d 69 (1986), the Supreme Court stated that the equal protection clause prohibits "purposeful discrimination" in the selection of petit jurors. A defendant need not show a "pattern" of discrimination by the prosecution, but discrimination could be based on actions of the prosecution in the particular case being tried, as long as it can be shown that a purposeful intent to discriminate is present. *Id.* at 95, 106 S.Ct. at 1722. To establish a prima facie case of discrimination the defendant must show: 1) the defendant is a member of a particular racial group; 2) the prosecutor used peremptory challenges to remove members of the defendant's race from the jury panel; and 3) that these facts and other relevant circumstances raise an inference that the prosecutor is discriminating on the basis of race. *Id.* at 96, 106 S.Ct. at 1722. The inference of discrimination can be drawn by proof of disproportionate impact upon the racial group, *e.g.,* the prosecutor totally excluded all blacks from the venire, or upon an examination of all the surrounding circumstances, *e.g.,* an examination of the prosecutor's questions in voir dire or stated reasons in exercising peremptory challenges or established past patterns of racial discrimination in jury selection. *Id.* at 96–97, 106 S.Ct. at 1722–1723. In this case, the trial judge found a prima facie case of discrimination because the only black on the jury panel was stricken by the prosecution.

Under *Batson* the prosecution must rebut the prima facie case by articulating a racially neutral reason for exercising the peremptory challenge. *Batson*, 476 U.S. at 97, 106 S.Ct. at 723. In chambers, the prosecutor mentioned that the juror's prior arrest record was the primary reason for striking him. For this reason, the court ruled that the prosecution had rebutted the defendant's prima facie case. This ruling is entitled to "great deference" on review. *Id.* at 98 n. 21, 106 S.Ct. at 1724 n. 21.

Other jurisdictions have held that a juror's prior arrest record is a neutral ground for exercising a peremptory challenge. *See, e.g., United States v. Forbes*, 816 F.2d 1006, 1010 (5th Cir.1987) (venire-person's son had been in trouble with the law); *People v. Talley*, 152 Ill.App.3d 971, 987, 105 Ill.Dec. 800, 809, 504 N.E.2d 1318, 1327 (1987). Thus, the prosecution in this case rebutted defendant's prima facie case. The trial court, however, must still determine that the prosecutor's reasons were genuine and not merely a pretext for discrimination. *Garrett v. Morris*, 815 F.2d 509, 511 (8th Cir.1987). Appellant argues that the trial court failed to evaluate whether the stated reasons for striking the juror were pretextual, especially since the prosecution did not immediately cite the juror's criminal history as the primary reason for the peremptory challenge, but rather first discussed his lack of education and employment—invalid reasons often used to justify discriminatory treatment of blacks. Nevertheless, the prosecution *did* cite the juror's criminal history and her questioning of the juror during voir dire indicate that his prior arrest record was the reason that he was challenged. There is no clear proof that the stated reason was pretext for racial discrimination. The trial court's ruling on this issue was not erroneous, especially in light of the "great deference" his finding is given on review.

■ 4. Appellant challenges the sufficiency of evidence to convict him of first degree murder. He claims that the evidence supporting his conviction is primarily the testimony of John Edmondson and William Johnson, and that those two eyewitnesses are simply not credible. He attacks their credibility based on, first, self-interest, since both were present in the car when Ferguson was killed, and they may have testified against appellant to absolve

themselves of their own culpability. Second, appellant claims that their friendship and loyalty to each other induced them to lie to protect each other. An example of this is Edmondson's initial claim that William Johnson was not present during the murder. Third, he argues that the main witnesses, including Faye Myers, gave inconsistent and contradictory stories to the police and in their grand jury testimony. At trial, all three of the witnesses admitted to giving false statements to the police, and each witness was extensively cross-examined by defense counsel on his or her inconsistent statements and testimony.

In reviewing the record, this court views the evidence in the light most favorable to the jury's verdict, assuming the jury believed the state's witnesses and disbelieved any evidence to the contrary. *State v. Wahlberg*, 296 N.W.2d 408, 411 (Minn. 1980). The weight and credibility of the testimony of individual witnesses is for the jury to determine. *State v. Engholm*, 290 N.W.2d 780, 784 (Minn.1980). The jury in this case had ample opportunity to evaluate the credibility of these witnesses based on their interest and past inconsistent statements. Based on the witnesses' version of the facts presented at trial, the jury could reasonably conclude that appellant was proven guilty of the offenses charged beyond a reasonable doubt. *See State v. McCullum*, 289 N.W.2d 89, 91 (Minn.1979). In sum, the evidence is sufficient to support the verdict.

5. Appellant's final argument is that the jury's verdicts finding him guilty of both first and second degree murder are legally inconsistent, entitling him to a new trial. It is clear that *logically* inconsistent verdicts do not entitle a defendant to a new trial. *Olkon*, 299 N.W.2d at 104; *State v. Juelfs*, 270 N.W.2d 873, 874 (Minn.1978); *see, generally* Annot. 18 A.L.R.3d 259. Appellant argues that this case presents an

instance of *legally* inconsistent verdicts, *i.e.*, a necessary element of each offense, premeditation, was subject to conflicting findings. *See, e.g., People v. Hoffer*, 106 Ill.2d 186, 191–192, 88 Ill.Dec. 20, 25, 478 N.E.2d 335, 340 (1985). The elements of first degree murder, Minn.Stat. § 609.185, are: 1) causing the death of another; 2) with premeditation, and 3) intent. Second degree murder is: 1) causing the death of another; 2) with intent; 3) but without premeditation. Minn.Stat. § 609.19(1). A guilty verdict on both types of murder is at least "logically" inconsistent because it finds both the presence and the lack of premeditation. It is not "legally" inconsistent unless lack of premeditation is a necessary element of second degree murder.

Second degree murder is a lesser included offense to first degree murder. *State v. Walker*, 306 Minn. 105, 120–121, 235 N.W. 2d 810, 820 (1975). If all of the elements of first degree murder are established, then the elements of second degree murder are also established. Furthermore, if lack of premeditation was a necessary element, the state in a prosecution of second degree murder would be required to prove that premeditation was absent. Such a requirement would be unreasonable. The lack-of-premeditation component of second degree murder thus cannot be an essential element of that crime. Guilty verdicts for first and second degree murder are not legally inconsistent, especially where the appellant is sentenced and judgment is entered only on the first degree murder conviction. The appellant is not entitled to a new trial.

Affirmed.