**STATE of Minnesota, Respondent,**

v.

**Scott Nolan KING, Appellant.**

**No. C9–93–479.**

Supreme Court of Minnesota.

March 11, 1994.

**246**

John M. Stuart, State Public Defender, Susan K. Maki, Asst. State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, and Michael O. Freeman, Hennepin County Atty., Linda M. Freyer, Asst. County Atty., Minneapolis, for respondent.

## OPINION

COYNE, Justice.

Defendant, Scott Nolan King, was found guilty by a district court jury of first-degree murder, Minn.Stat. § 609.185(2) (1992), for killing and raping an acquaintance, Gwendolyn Lewis, in her apartment in north Minneapolis on or about February 6, 1992. The trial court sentenced him to life in prison. Seeking a new trial, defendant argues, *inter alia*, that the trial court erred in denying his motion to suppress evidence on constitutional grounds and erred in admitting other-crime evidence. We affirm.

At 8:00 p.m. on the evening of February 8, 1992, the victim's son discovered her partially-clad body slumped over the bathtub, with her head and shoulders in the bloody water. She had been stabbed over 20 times and had lost over 10 pints of blood. The medical examiner concluded that the victim had been sexually assaulted around the time of her death, quite possibly shortly afterwards, and opined that death occurred between 18 and 48 hours before the body was discovered.

The state's theory was that she was killed late on the evening of February 6, shortly after a neighbor saw her. The state also theorized that she had used crack cocaine shortly before she was killed because the autopsy showed the presence of unmetabolized cocaine in her system. Based on interviews with neighbors and friends of the victim, police began to suspect defendant, who supplied crack to residents of the building and who had been seen in the building late on February 6.

On April 1 police obtained a warrant authorizing the removal of a sample of blood from defendant for DNA analysis and comparison with DNA in the semen found in and on the victim's body. Sergeant Don Wagenknecht, an experienced homicide investigator, based the warrant application on two key items of information. First, Donald Allen, once himself a suspect in the killing, told Wagenknecht that in December of 1991 defendant had threatened the victim. Second, Richard Davis, the father of the victim's son, told Wagenknecht that he had heard defendant, while high on crack, admit to another man, James Nunn, that he killed the victim. Davis added that defendant had later tried to reassure the victim's son that he had not meant what he had said. Wagenknecht did not know Davis but was assured by Russell

Krueger, an investigator with the public defender's office who formerly worked as a homicide investigator in the Minneapolis Police Department, that Davis had provided him with reliable information in the past.

Police executed the warrant on the morning of April 2 by going to defendant's place of employment, presenting the warrant and asking him to accompany them to the Hennepin County Medical Center for the removal of a blood sample. Defendant was not given a *Miranda* warning, nor was he handcuffed or told he was under arrest. On the way to the hospital Wagenknecht told defendant that he felt defendant was involved in the killing of the victim and that the purpose of obtaining a blood sample was to compare defendant's DNA with the DNA in the semen left by the killer. Defendant replied that he knew all about DNA profiling and said that since he had never had sex with the victim he was more than glad to give a sample of his blood for analysis.

Analysis of the DNA in defendant's blood showed that it matched the DNA in the semen found in and on the victim's body. After obtaining the results of the analysis, police on April 22 returned to defendant's place of employment and arrested him, telling him that they had received the blood test results. One of the arresting officers testified defendant replied, "I knew it. Just because I fucked her doesn't mean I killed her, does it?" Later, during five hours of interrogation, defendant finally said, "I done killed this woman." In his formal statement, he admitted that it was "possible" that he killed Gwendolyn Lewis "because there was no one there but her and me." At no time, however, did defendant say that he knew for sure that he had killed the victim. And he claimed that the sexual intercourse was in exchange for the crack he provided.

Defendant argued at the pretrial suppression hearing that the search warrant application contained an intentional or reckless misrepresentation of fact material to the determination of probable cause, that the warrant was therefore invalid, and that because his arrest resulted from the blood testing, performed pursuant to the warrant, the incriminating statements he made following his arrest should be suppressed as fruits of an unlawful search. He also argued that the statement he made when the search warrant was executed should be suppressed because it was made in response to custodial interrogation without his having been given a *Miranda* warning. The trial court denied the motion to suppress in its entirety.

Key evidence against defendant at trial included: (a) testimony that defendant supplied crack cocaine to the residents of the apartment building, including the victim, (b) testimony of several witnesses that placed defendant in the apartment across the hall from the victim's apartment earlier on the evening that the killing was believed to have occurred, (c) testimony by two people, Shawn Dillon and Randy Coleman, that several days after the murder they heard defendant admit he killed the victim, (d) defendant's various statements to the police, (e) expert testimony that the DNA in defendant's blood "matched" the DNA in the semen found in and on the victim's body, and (f) *Spreigl* or other-crime evidence that in December of 1987 defendant had brutally assaulted another female acquaintance, while threatening to kill her, and had dragged her partially clad body down a flight of stairs, leaving a trail of blood as he did so.

■ 1. Defendant's first contention is that the search warrant application contained a reckless misrepresentation of fact material to the determination of probable cause, that the warrant was therefore invalid, and that because his arrest resulted from the blood testing, the incriminating statements he made following his arrest should be suppressed as fruits of an illegal search.

Defendant bases his argument on the fact that after the warrant was executed (a) Allen retracted his earlier statement that in December of 1991 defendant had threatened the victim and (b) Davis admitted that he had not personally heard defendant admit killing the victim, that instead, two others, Dillon and Coleman, had heard the admissions.

In *State v. Moore*, 438 N.W.2d 101 (Minn. 1989), we said:

> A search warrant is void, and the fruits of the search must be excluded, if the

application includes intentional or reckless misrepresentations of fact material to the findings of probable cause. A misrepresentation is "material" if when set aside there is no longer probable cause to issue the search warrant. If so, then the court must determine that the police deliberately or recklessly misrepresented facts, because innocent or negligent misrepresentations will not invalidate a warrant.

*Id.,* at 105 (citations omitted); *see also Franks v. Delaware,* 438 U.S. 154, 171–72, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978).

The state concedes the affidavit of Sergeant Wagenknecht offered in support of the application contained material misrepresentations. The defense argues that these misrepresentations, while not intentional, were reckless rather than innocent or negligent.

Wagenknecht testified at the suppression hearing that he spoke directly with Davis, the informant, who told him that he had heard defendant admit the killing in Nunn's apartment with Nunn present. He testified further that he had tried but failed to contact Nunn. Defendant argues that Davis' relationship to the victim—father of her child—impugns Davis' credibility and should have alerted Wagenknecht to the possibility that his statement was not reliable. The state counters that Davis' relationship with Lewis "would prompt him to provide reliable information rather than false information, in order to assist the police in finding [Lewis' murderer]." In our opinion, the defendant has not shown any valid reason why Wagenknecht should have doubted Davis' information, especially since Krueger, whom Wagenknecht knew and who put Wagenknecht in touch with Davis, vouched for his reliability. Under the circumstances, we believe the trial court was justified in determining that Wagenknecht did not deliberately or recklessly misrepresent any facts in his affidavit in support of the application for the search warrant.

2. Defendant also argues that the statement he made when the search warrant was executed should be suppressed because it was made in response to custodial interrogation without his having been given a *Miranda* warning.

The state argues that defendant was not "in custody" because he was told he was not under arrest, he was not handcuffed, he agreed to accompany the officers to the hospital, and he was returned to his workplace after he gave the blood sample. The state argues further that Sergeant Wagenknecht did not "interrogate" defendant but rather "simply explained * * * the purpose of the search warrant."

Under *Berkemer v. McCarty,* 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), the appropriate inquiry in determining "custody" for *Miranda* purposes is whether a reasonable person in the suspect's position would have believed his freedom of movement was curtailed to a degree associated with formal arrest. *See also Minnesota v. Murphy,* 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984), and *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). "Interrogation" under *Miranda* refers "not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980) (footnotes omitted). *See also Arizona v. Mauro,* 481 U.S. 520, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987).

We need not decide whether the statement in question was made in response to custodial interrogation because we are satisfied that *if* error was made in admitting the statement in question, the error was harmless error beyond a reasonable doubt. *Milton v. Wainwright,* 407 U.S. 371, 377–78, 92 S.Ct. 2174, 2178, 33 L.Ed.2d 1 (1972).

3. The only other contention by defendant which we need to address in any detail is his contention that the trial court erred in admitting the other-crime evidence.

Minn.R.Evid. 404(b) provides:

Evidence of another crime, wrong, or act is not admissible to prove the character of a person in order to show action in conformity therewith. It may however, be

admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. In a criminal prosecution, such evidence shall not be admitted unless the other crime, wrong, or act and the participation in it by a relevant person are proven by clear and convincing evidence.

In *State v. Frisinger*, 484 N.W.2d 27, 32 (Minn.1992), we said:

> The trial court initially should follow the clear wording of Rule 404(b) and look to the real purpose for which the evidence is offered. Under the rule, other-crime evidence is not admissible to prove the character of a person in order to show that the person acted in conformity therewith; but the evidence may be admitted, if for a legitimate purpose, rather than for the forbidden purpose of inferring propensity from character. If the evidence is offered for a legitimate purpose, then the exclusion sanction of Rule 404(b) does not apply.

We explained this further more recently in *State v. Wermerskirchen*, 497 N.W.2d 235, 239–40 (Minn.1993) (footnote omitted), where we added:

> The rule is a specific application of the "rule of multiple admissibility"—evidence that is inadmissible for one purpose (inference from intermediate inference of bad character to inference that defendant acted in conformity therewith) should not be excluded if it is properly admissible for some other purpose (unless the trial court, in the exercise of discretion under Rule 403, decides to exclude the evidence).

We have also said that as an aid in deciding the relevance of other-crime evidence offered under Rule 404(b), the trial court should "focus on the closeness of the relationship between the other crimes and the charged crimes in terms of time, place and modus operandi," the reason being that "the closer the relationship, the greater is the relevance or probative value of the evidence and the lesser is the likelihood that the evidence will be used for an improper purpose." *State v. Frisinger*, 484 N.W.2d at 31.

In this case the other-crime evidence was not offered for an improper purpose. Rather, it appears that the evidence was relevant evidence tending to show defendant's identity as the killer of Lewis and also was relevant common scheme or plan evidence tending in some way to assist the jury in determining whether the act of intercourse was a voluntary sex-for-drugs act (as defendant maintained in his statement to the police) or constituted criminal sexual conduct (as the medical examiner's testimony indicated and as required in order to convict defendant of first-degree murder under section 609.185(2)). Moreover, there was a sufficient, though admittedly not perfect, similarity between the two offenses: defendant knew both women; both assaults occurred in the residence of the victim; both assaults were particularly brutal; both women were dragged, leaving a trail of blood; both victims were left in a partially clad state. In the words of *State v. Berry*, 484 N.W.2d 14, 18 (Minn.1992), the evidence "served to complete the picture of [defendant], not to paint another picture."

In summary, we have considered all of the claims made by defendant, including those in his pro se supplemental brief, and we conclude that he received a fair trial and was properly found guilty of first-degree murder.

Affirmed.