STATE of Minnesota, Respondent,

v.

Abdelhamid (NMN) MAIDI, Appellant.

No. C9–93–1955.

Court of Appeals of Minnesota.

Aug. 2, 1994.

Review Granted Sept. 28, 1994.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, James C. Backstrom, Dakota County Atty., Stuart E. Shapiro, Asst. County Atty., Hastings, for respondent.

John M. Stuart, State Public Defender, Lawrence Hammerling, Deputy State Public Defender, Bradford Colbert, Asst. State Public Defender, Minneapolis, for appellant.

Considered and decided by KALITOWSKI, P.J., and HUSPENI and AMUNDSON, JJ.

## OPINION

KALITOWSKI, Judge.

Appellant Abdelhamid Maidi was convicted of depriving another of custodial or parental rights in violation of Minn.Stat. § 609.26, subd. 1(4) (1990). Appellant contends: (1) the evidence is insufficient to prove that an action relating to child visitation or custody had been commenced before he took the children; and (2) the sentencing court erred in ordering him to pay more than $147,000 in restitution.

## FACTS

In 1984, appellant, a native of Algeria, married Aimee Maidi, an American citizen. Two children were born during their marriage: A.M. in June 1985 and D.M. in June 1988. The Maidis lived in Algeria until Aimee and the children moved to Minnesota in December 1989. Appellant subsequently moved to the United States to live with Aimee and the children. In July 1990, however, appellant moved to Indiana but Aimee and the children remained in Minnesota.

In October 1991, appellant and Aimee began the process of dissolving their marriage. Aimee's attorney provided her with two copies of the Summons and Petition for Dissolution, which included provisions relating to the custody and visitation of the children and an Affidavit of Personal Service. Aimee's attorney advised her that, as a party, she could not serve the summons and petition upon appellant. *See* Minn.R.Civ.P. 4.02.

On October 12, 1991, Aimee told appellant that she had made arrangements to have the summons and petition served by Nikole Coleman. Appellant and Aimee went to Coleman's apartment and Aimee handed the envelope containing the summons and petition to Coleman. Without looking inside the envelope, Coleman handed the summons and petition to appellant, then signed the affidavit of service. Appellant subsequently signed a temporary relief stipulation after Aimee agreed to certain changes.

Appellant left for Indiana with the children on October 14, 1991. On or about October 19, 1991, appellant took the children to Algeria without Aimee's permission. Aimee repeatedly requested appellant to return the children, but he refused. On November 14, 1991, a complaint was filed in Dakota County charging appellant with two counts of depriving another of custodial or parental rights in violation of Minn.Stat. § 609.26, subd. 1(4).

Aimee contacted various attorneys, law enforcement agencies, politicians and missing children groups seeking help to retrieve her children. Unable to find assistance, Aimee hired the International Program Group to "counterabduct" her children from Algeria to the United States. After one failed attempt, the children were returned to Aimee in April 1992. The cost of the counterabduction effort was $141,527.72.

On November 25, 1992, appellant returned to the United States and turned himself in to law enforcement authorities. Appellant waived a jury trial and the trial court found appellant guilty of both counts of depriving another of custodial or parental rights. Appellant was sentenced to six months in jail under a stay of imposition of sentence, placed on probation for two years, and ordered to pay restitution as determined by Dakota County Community Corrections (community corrections). Following a restitution hearing, the sentencing court ordered appellant to pay $147,251.27 [1] in restitution. This appeal followed.

## ISSUES

1. Is the evidence sufficient to prove that appellant took the children after the commencement of an action relating to child visitation or custody?

2. Did the sentencing court err in ordering appellant to pay more than $147,000 in restitution in light of: (1) the recommendation of community corrections; (2) the fact that the expenses were incurred in counterabducting the children; and (3) appellant's ability to pay?

3. Should this court strike appellant's pro se supplemental brief?

## ANALYSIS

### I.

◼ Appellant was convicted of violating Minn.Stat. § 609.26, subd. 1, which provides that whoever intentionally

> takes, obtains, retains, or fails to return a minor child from or to a parent *after commencement of an action relating to child visitation or custody* but prior to the issuance of an order determining custody or

---

1. The sentencing court's order actually set restitution at "$147,527.27." It is clear from the record, however, the sentencing court intended to set restitution at "$147,251.27." Accordingly, we modify this clerical error to reflect the correct figure.

visitation rights, where the action manifests an intent substantially to deprive that parent of parental rights [may be charged with a felony].

(Emphasis added.) Appellant argues that the evidence is insufficient to find that an action for child visitation or custody commenced before he took the children. We disagree.

When a defendant challenges the sufficiency of the evidence, our review is limited to an analysis of the record to determine whether the evidence, when viewed in a light most favorable to the conviction, was sufficient to permit the fact finder to reach the verdict that it did. *State v. Webb,* 440 N.W.2d 426, 430 (Minn.1989). We must assume the fact finder believed the state's witnesses and disbelieved any evidence to the contrary. *State v. Moore,* 438 N.W.2d 101, 108 (Minn. 1989).

Section 609.26, subdivision 1(4) requires the state to prove that appellant took the children "after commencement" of a child visitation or custody action. In Minnesota, an action is commenced against a defendant "when the summons is served upon that defendant." Minn.R.Civ.P. 3.01(a); *see also* Minn.Stat. § 518.09 (1990) (dissolution actions are "commenced by personal service of the summons and petition"). Service may be made by "the sheriff or any other person not less than 18 years of age and not a party to the action." Minn.R.Civ.P. 4.02. Service of a summons shall be perfected by "delivering a copy to the individual personally." Minn. R.Civ.P. 4.03(a). Service of a summons must be done "*knowingly* and *intentionally.*" *Lee v. Skrukrud,* 231 Minn. 203, 204, 42 N.W.2d 544, 545 (1950) (emphasis added).

■ Appellant argues, relying on *Lee,* that Coleman did not knowingly serve the summons and petition because she did not personally inspect the contents of the envelope before she served the summons and petition. In *Lee,* a third person attempted service for the plaintiff by trying to leave a copy of the summons at the defendant's home with the defendant's daughter, but she refused to open the door. *Id.* at 203, 42 N.W.2d at 545. The plaintiff gained admission to the home by calling police to investigate a case of

juvenile delinquency. When the police entered the home, the plaintiff followed and handed the daughter the summons. *Id.* at 204, 42 N.W.2d at 545. The daughter refused to take the papers and tried to throw them on the ground. One of the police officers, without knowing the papers included a summons, "shoved" the papers in the daughter's pocket. *Id.* The supreme court held there was no service because

no finding could be sustained that [the police officer] intended to serve, or knew that he had served, a summons. In fact, he did not know the nature of the papers involved.

*Id.*

Here, Aimee Maidi told Coleman that the papers were a summons and petition. Thus, unlike the police officer in *Lee,* Coleman intended to serve a summons and petition and acknowledged by signed affidavit of service that she had personally delivered a copy of the summons and petition to appellant. No rule requires a process server to personally inspect a summons and petition prior to service. Moreover, to impose such a requirement would be contrary to the liberal construction to be applied to rule 4.03(a), especially where appellant was not misled or prejudiced by service of the summons and petition. *See Haas v. Brandvold,* 418 N.W.2d 511, 513 (Minn.App.1988) (quoting *Tharp v. Tharp,* 228 Minn. 23, 24–25, 36 N.W.2d 1, 2 (1949)). We, therefore, hold the evidence is sufficient to sustain the trial court's conclusion that appellant took the children "after a legal action relating to child visitation or custody had been commenced." Accordingly, appellant's convictions are affirmed.

## II.

Appellant contends the sentencing court erred in ordering him to pay more than $147,000 in restitution because: (1) the sentencing court erred in failing to follow the recommendation of community corrections; (2) the expenses incurred in counterabducting children, as a matter of public policy, should not be recoverable as restitution; and (3) the sentencing court erred in failing to consider his ability to pay. We disagree.

Because the district court is in the best position to weigh the various sentencing options, it is granted wide discretion in ordering reasonable restitution. *State v. O'Brien*, 459 N.W.2d 131, 133 (Minn.App.1990).

### A. Recommendation of Community Corrections

The sentencing court initially ordered appellant to pay restitution "as determined by Community Corrections." Appellant's probation officer recommended restitution in the amount of "$5,723.55, plus any future losses related to counseling for Ms. Maidi and her children." The probation officer reasoned that counterabduction efforts "do not meet the correction department's criteria for criminal restitution" and that Aimee Maidi could seek reimbursement through a civil action. Following a restitution hearing, the sentencing court ordered appellant to pay more than $147,000 in restitution which included the expenses incurred by Aimee Maidi in the counterabduction.

Appellant argues the sentencing court erred in ordering restitution in an amount greater than the amount recommended by community corrections. We disagree.

It is the sentencing court's decision to "grant or deny restitution." Minn.Stat. § 611A.04, subd. 1(c) (1992). Any "dispute as to the proper amount" of restitution "must be resolved by the court." Minn.Stat. § 611A.045, subd. 3 (1992). Accordingly, we hold the sentencing court did not err in declining to follow the recommendation of community corrections. *See, e.g., California v. Hyatt*, 18 Cal.App.3d 618, 96 Cal.Rptr. 156, 162 (1971) (where probation department was "ordered to determine the amount and manner of restitution," the determination was subject to review by the court).

### B. Counterabduction Expenses

Appellant argues that expenses incurred in counterabducting children from a foreign country should not, as a matter of public policy, be recoverable as restitution. We disagree.

Initially, we note that Aimee Maidi cannot pursue a civil action for interference with custodial rights. *See Larson v. Dunn*, 460 N.W.2d 39, 44–47 (Minn.1990) (refusing to create a cause of action for the tort of "intentional interference with custodial rights"). In addition, Minn.Stat. § 609.26, subd. 4 (1990) provides, in part, that:

> A child who has been concealed, obtained, or retained in violation of this section shall be returned to the person having lawful custody of the child * * *. In addition to any sentence imposed, *the court may assess any expense incurred in returning the child* against any person convicted of violating this section.

(Emphasis added.) Under the plain language of this statute, the sentencing court was authorized to assess "any expense" incurred in returning the children.

The sentencing court found that "the victim suffered out-of-pocket losses by incurring counter-abduction expenses to transport her children from Algeria back to the United States." Thus, but for appellant's unlawful deprivation of custodial rights, Aimee Maidi would not have incurred the counterabduction expenses. Accordingly, the sentencing court did not err in determining that such expenses were properly recoverable as restitution. *Cf. Plante v. Engel*, 124 N.H. 213, 469 A.2d 1299, 1302 (1983) (damages flowing from interference with parental custody include expenses incurred in recovering the child); *Washington v. Halsen*, 111 Wash.2d 121, 757 P.2d 531, 532 (1988) (a victim of custodial interference may recover reasonable expenses incurred in locating and recovering the child).

Appellant suggests that to uphold the restitution award would be contrary to public policy by encouraging people to resort to unlawful remedies. We disagree. The sentencing court determined that Aimee Maidi "exhausted all other legal avenues to return her children to the United States." Therefore, although we do not intend by our holding to encourage the method utilized by Aimee Maidi in retrieving her children, we cannot deem Aimee's actions to be a violation of public policy.

### C. Appellant's Ability to Pay

■ Appellant contends the sentencing court erred in ordering him to pay more than $147,000 in restitution. Appellant argues that there is no rehabilitative rationale for ordering a restitution award that he may not be able to pay completely. We disagree.

■ Restitution serves to both compensate the victim and rehabilitate the defendant. *State v. Belfry*, 416 N.W.2d 811, 813 (Minn.App.1987). In determining the amount of restitution the sentencing court must consider:

(1) the amount of economic loss sustained by the victim as a result of the offense; and

(2) the income, resources, and obligations of the defendant.

Minn.Stat. § 611A.045, subd. 1 (1992). Where the goal of restitution is to rehabilitate the defendant, the amount of restitution should be set according to the defendant's ability to pay. *State v. Harwell*, 515 N.W.2d 105, 110 (Minn.App.1994), *pet. for rev. denied* (Minn. June 15, 1994).

We conclude that the sentencing court properly considered the applicable statutory factors. First, although it is possible that appellant may not be able to pay the entire restitution award, the court was also required to consider Aimee Maidi's economic losses. Minn.Stat. § 611A.045, subd. 1.

Second, appellant's potential inability to pay the entire amount does not require us to conclude that his monthly payments to Aimee Maidi serve no rehabilitative purpose. *See Belfry*, 416 N.W.2d at 813 (the defendant's payment to the victim serves a rehabilitative purpose). Appellant's payments provide a monthly reminder of the costs endured by his victim, and may deter him or others from committing similar crimes.

■ Third, we conclude that the sentencing court adequately considered appellant's ability to pay. The sentencing court ordered appellant to pay more than $147,000 in restitution in $200 monthly installments "until the sum is paid in full." After finding that appellant earned $6.50 per hour and considering appellant's current debts and obligations, the sentencing court concluded that appellant could comply with $200 monthly restitution payments. The court further ordered that any sum remaining unpaid at the termination of appellant's probation would be entered as a civil judgment against him. The award, accruing at a statutory three percent interest rate, will accrue approximately $4400 in interest this year. Because appellant will only pay $2400 per year, the size of the judgment will actually increase. Nevertheless, we conclude that appellant's reasonable ability to pay restitution is not determined solely by reference to his ability to pay the award in full. Instead, a determination of reasonableness is appropriately based on a defendant's ability to pay the requisite installments. *See, e.g., Iowa v. Van Hoff*, 415 N.W.2d 647, 648–49 (Iowa 1987) (holding defendant must pay restitution award of $16,500 that would require defendant, paying 20 percent of his prison earnings, 92 years to pay); *Iowa v. Wagner*, 484 N.W.2d 212, 219–20 (Iowa App. 1992) (holding defendant must pay restitution award in excess of $100,000 that would require defendant, paying 25 percent of his monthly income, 5046 years to pay).

Finally, although the sentencing court found that appellant earned $6.50 per hour, his ability to pay may increase in the future. Because the record demonstrates that appellant has the ability to pay $200 per month toward the restitution award, the monthly payment is not unreasonable. Accordingly, we hold the sentencing court did not abuse its broad discretion in ordering appellant to pay more than $147,000 in restitution at the rate of $200 per month.

### III.

■ The state has moved to strike appellant's pro se supplemental brief, arguing that it contains matters that are not part of the record on appeal. We agree.

■ The record on appeal consists of "[t]he papers filed in the trial court, the exhibits, and the transcript of the proceedings, if any." Minn.R.Civ.App.P. 110.01. Generally, we may not base our decision on matters outside the record on appeal, and may not consider matters not produced and

received in evidence below. *Thiele v. Stich,* 425 N.W.2d 580, 582–83 (1988).

In his pro se brief, appellant denies claims made by Aimee Maidi at trial and, in effect, gives testimony. Appellant had the opportunity to present this evidence at trial but he chose not to testify. Because appellant attempts to set forth facts outside the record, we grant the state's motion to strike appellant's pro se supplemental brief.

## DECISION

The evidence is sufficient to prove that appellant took the children after the commencement of an action relating to child visitation or custody. Therefore, we affirm appellant's convictions. Additionally, we hold the sentencing court did not abuse its discretion in ordering appellant to pay restitution of more than $147,000 in $200 monthly installments. Finally, we modify the restitution award to $147,251.27 to accurately reflect the record.

**Affirmed as modified.**

AMUNDSON, Judge (concurring in part, dissenting in part).

I concur in that part of the majority's decision affirming appellant's conviction for deprivation of custodial or parental rights. I respectfully dissent, however, from that part of the majority's decision affirming the sentencing court's order that appellant pay over $147,000 in restitution.

Today, this court's countenance of the restitution award is akin to the indenture practice in ancient times. I thought that by now our society had recognized the danger of involuntary servitude resulting from obligations that are beyond a debtor's ability to pay. We could learn from our past.

Hebrew tradition commanded a Jubilee. Every fiftieth year, the Israelites were to observe a period in which all debts were canceled, slavery was terminated and land was restored to its original owners. Additionally, every seven years, the Israelites had a sabbatical year of release described in the fifteenth chapter of *Deuteronomy.*

The Babylonian king Hammurabi codified the concept of bankruptcy in his famous Code. It provided for creditors to take all of an insolvent debtor's goods as payment in full of the debt.

Even the Romans eventually modified their view of debtors rights. Early Roman law provided for "vengeance"—entitling a citizen to dismember any debtor who could not or would not pay. During the time of Julius Caesar, however, Roman jurisprudence incorporated the humane principle that where an insolvent debtor honestly turned over all property for the benefit of creditors, the debtor would no longer be subject to capital punishment, slavery or imprisonment. Today, some historians trace the origins of modern bankruptcy law to Roman law in 118 B.C.

American bankruptcy law finds its origin in the English Bankruptcy Acts dating back to 1542. When our Constitution was framed in 1787, Congress was given the right to establish "uniform Laws on the subject of Bankruptcies." U.S. Const. art. I, § 8, cl. 4. The first actual bankruptcy law of the United States was passed in 1800. Modern bankruptcy law serves in part to free a debtor from the burden of unpaid debts.

More recently, following the unhappy experience of the Great Depression, our own legislature attempted to prevent economic serfdom by outlawing deficiency judgments in mortgage foreclosure actions. *See* Minn. Stat. § 580.225 (1992) (amount received from foreclosure sale is full satisfaction of the mortgage debt). Moreover, modern mortgage law also gives the debtor an opportunity to redeem the property. *See* Minn.Stat. 580.23 (Supp.1993).

I am afraid the sentencing court's decision invites us to ignore history, reality and our society's evolving attempt to assist debtors who are burdened with debts beyond their ability to pay. There is no question that crime victims may suffer enormous pecuniary damages. In many cases, a victim's damages will even exceed those sustained here by Aimee Maidi. Additionally, there is no doubt that victims deserve to be compensated. Our experience has taught us, however, that debilitating a person with a judgment that can

never be satisfied involves a greater misfortune.

Restitution has a twofold purpose: to rehabilitate the defendant and to compensate the victim. *See State v. Fader,* 358 N.W.2d 42, 48 (Minn.1984). In *Fader,* the supreme court determined that the primary purpose of restitution is to compensate the victim. *See id. Fader,* however, "must be interpreted in light of" case law from the United States Supreme Court. *State v. O'Brien,* 459 N.W.2d 131, 134 (Minn.App.1990).

After *Fader,* the United States Supreme Court, in a case examining the dischargeability of criminal restitution obligations in bankruptcy, stated:

> The criminal justice system is not operated primarily for the benefit of victims, but for the benefit of society as a whole. Thus, it is concerned not only with punishing the offender, but also with rehabilitating him.

*Kelly v. Robinson,* 479 U.S. 36, 52, 107 S.Ct. 353, 362, 93 L.Ed.2d 216 (1986). The Supreme Court concluded:

> Because criminal proceedings focus on the State's interests in rehabilitation and punishment, rather than the victim's desire for compensation, we conclude that restitution orders imposed in such proceedings operate "for the benefit of" the State. Similarly, they are not assessed "for * * * compensation" of the victim. The sentence following a criminal conviction necessarily considers the penal and rehabilitative interests of the State.

*Id.* at 53, 107 S.Ct. at 362–63. Thus, to the extent that *Fader* presupposes restitution only to achieve an economic "status quo ante" for the victim, it is "out of the context of subsequent United States Supreme Court case law." *O'Brien,* 459 N.W.2d at 134.

In establishing restitution, a sentencing court must consider the "income, resources, and obligations of the defendant." Minn. Stat. § 611A.045, subd. 1 (1992). In this case, appellant has been ordered to pay $200 per month in restitution. The sentencing court did not abuse its discretion in determining that appellant has the ability to pay $200 per month.[1] I believe, however, the sentencing court erred in failing to consider appellant's ability to pay the restitution award as a whole. *Cf. State v. Yost,* 235 Neb. 325, 455 N.W.2d 162, 164 (1990) (court reversed $105,000 restitution award where sentencing court did not "meaningfully" consider the defendant's earning ability, employment status, financial resources and other obligations).

The restitution award imposed upon appellant has been docketed as a judgment and is accruing interest at the statutory rate of three percent. *See* Minn.Stat. 549.09, subd. 1(a), (c) (Supp.1993) (money judgments accrue interest at rate indexed to treasury bills as determined by the state court administrator). At this rate, appellant's payments are not sufficient to pay even the interest. This results in a negative amortization and a curious posture for appellant. Even if appellant makes timely payments, the debt will grow larger with each payment. Does this make sense? Is this good policy? The simple answer, of course, is no. The restitution award in this case is not "reasonable." *See State v. Belfry,* 416 N.W.2d 811, 813 (Minn. App.1987). Moreover, such an award will not further the state's interest in rehabilitating appellant. *See Kelly,* 479 U.S. at 53, 107 S.Ct. at 362–63.

In a free society, men and women voluntarily follow the law and court decisions. They do so with minimal supervision as their conduct is compelled by hope as well as fear. They cooperate because they hope for a better day—that their labors will be rewarded. When you take away a person's ability to ever escape a growing economic burden, however, you defeat one of the most fundamental and provocative attractions to a free society. A person in appellant's position can never expect to own real estate, will be denied credit, and may suffer adverse personal relationships due to the ever burgeoning judgment. More than at any time in human history, credit is the coin of the realm and a person without credit in this society is a

---

1. Appellant's restitution payment was based on his income of $6.50 per hour. There is nothing in the record to suggest that now, or in the foreseeable future, appellant will have the means to pay more than $200 per month.

*persona non grata.* To what end will the majority's decision enhance appellant's ability to requite the legitimate claim of Aimee Maidi?

I do not believe it is the sentencing court's prerogative to create a scheme wherein each month, despite a defendant's adherence to the plan, a debt continually grows larger and can never be paid in full. This is the work of Sisyphus. No scheduled payment by appellant will ever lessen the debt. Appellant should not awake every day for the rest of his life with the stone rolling down a steeper and steeper hill.[2]

Under the facts of this case, I would hold that the sentencing court abused its discretion in creating such a happenstance. Accordingly, I respectfully dissent.

---

**2.** The slight possibility that appellant could win the lottery or unexpectedly come into a large sum of money some day does not justify an otherwise insurmountable restitution award. *See People v. Alvarado,* 142 Mich.App. 151, 369 N.W.2d 462, 466 (1984).