STATE of Minnesota, Respondent,

v.

Milton Omar Morataya BERRIOS,
Appellant.

No. A09–1675.

Court of Appeals of Minnesota.

Aug. 24, 2010.

Lori Swanson, Attorney General, Kelly O'Neil Moller, Assistant Attorney General, St. Paul, MN, Lamar Piper, Watonwan County Attorney, St. James, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, Lydia Villalva Lijó, Assistant Public Defender, St. Paul, MN, for appellant.

Considered and decided by Chief Judge TOUSSAINT, Presiding; WRIGHT, Judge; and MUEHLBERG, Judge.*

## OPINION

WRIGHT, Judge.

Appellant challenges his conviction of third-degree criminal sexual conduct, arguing that the district court abused its discretion by removing a seated juror after the juror requested foreign-language interpretive services on the second day of trial. Appellant also contends that the evidence was insufficient to support the verdict, and he raises additional issues in a pro se supplemental brief. We affirm.

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

## FACTS

Appellant Milton Berrios was charged with third-degree criminal sexual conduct, a violation of Minn.Stat. § 609.344, subd. 1(d) (2008) (prohibiting sexual penetration of a physically helpless person if the actor knows or has reason to know of the helplessness).[1] During the jury trial that followed, the proceedings were interpreted into Spanish for Berrios.

The complainant, 18–year–old B.P., testified as follows. B.P. was invited to a coworker's home on Saturday, March 21, 2009. B.P. arrived at the coworker's house at approximately 11:20 p.m. The coworker, Brenda Tucker, introduced B.P. to Berrios and to Tucker's cousin, Donald Big Bear. In the company of Tucker and Berrios, B.P. had one mixed drink and several shots of rum.

B.P.'s classmate, Josh Hurley, later arrived at the house, and B.P. accompanied Hurley on a drive to pick up a friend. B.P. was so intoxicated that she could not remember where they went, whom they picked up, or how long they were gone. But B.P. remembered vomiting near Hurley's car and passing out while in the car. She called a friend at 1:56 a.m., but she did not recall the conversation.

B.P. and Hurley returned to Tucker's house early on Sunday morning, March 22. B.P. described her state of consciousness as "falling down drunk." Hurley and another person helped B.P. into the house and placed her on a bed in an upstairs bedroom. The next thing that B.P. remembered was Berrios pulling down her pants. When she said "no," Berrios stopped, and B.P. passed out. B.P. later woke up vomiting and discovered Berrios on top of her with his penis inside her vagina. B.P., who could not move her body, kept passing out. She was unable to prevent Berrios from having sexual intercourse with her. And she did not give anyone permission to have sex with her that night.

B.P. awoke at approximately 9:30 a.m. She was naked from the waist down, and Berrios was lying on the floor near the end of the bed. Before leaving the house, B.P. spoke briefly with Big Bear and told him that she had been ill.

On Monday, March 23, B.P. told her school counselor that she had been sexually assaulted. The counselor characterized B.P.'s demeanor as scared, upset, and sad.

Medical records, the testimony of B.P., the testimony of the counselor, and the testimony of the medical doctor who conducted the sexual-assault examination establish that B.P. was unsure of some of the details of the sexual assault. For example, B.P. was not certain if Berrios ejaculated. But B.P. recalled with certainty that Berrios's penis had entered her vagina and that he did not wear a condom while doing so.

A forensic scientist testified that sperm cells found on B.P.'s underwear matched Berrios's DNA profile. Vaginal swabs taken from B.P. contained a mixture of DNA that matched Berrios and B.P.

Hurley testified that he did not consume alcohol on the night of the assault. When he arrived at Tucker's house, B.P. was intoxicated and had difficulty walking. He and B.P. went for a ten-minute drive and returned to the house at approximately 1:45 a.m. Hurley and Berrios carried B.P. into the house because she could not walk and was feeling ill. Her speech was not coherent or clear. Once inside the house, B.P. vomited on the floor. Hurley and Berrios then brought B.P. to an upstairs bedroom and placed her on the bed. The

1. The complaint was amended to include one count of third-degree criminal sexual conduct

(force or coercion) on which the district court entered a judgment of acquittal.

men left the room and closed the door, and Hurley left the house.

City of St. James Police Officer Rochelle Hanson testified that she interviewed Berrios on March 23. Through interpreters, Berrios told Officer Hanson that he began drinking with Tucker and Big Bear at 4:00 p.m. on March 21. At approximately 11:20 p.m., B.P.[2] arrived at the house. After drinking alcohol, B.P. left the house with some friends. Berrios stated that he had consumed a lot of alcohol and did not remember anything involving B.P. after she left. He also stated that B.P. had been fighting with a boy in a car and that she and the boy had gone upstairs together. Berrios, Big Bear, and Tucker went to sleep in the living room at approximately 2:00 a.m. Later, they went outside to talk and smoke cigarettes. They again fell asleep in the living room. Berrios also stated that he awoke in his upstairs bedroom.

Big Bear testified that he began drinking at 4:00 p.m. on March 21 and slept from 7:00 p.m. to 10:00 p.m. He remembered B.P.[3] being at the house and leaving several times. Between 1:00 a.m. and 2:00 a.m., she returned to the house and vomited in the bathroom. B.P. then went upstairs with Berrios. Big Bear described her as "goofy" but not intoxicated. While Big Bear sat in the main-level dining room, he could hear a consensual sexual encounter taking place between Berrios and B.P. in an upstairs bedroom. Big Bear went to sleep in the living room and awoke at 6:30 a.m. B.P. came downstairs at 7:00 a.m. and spoke with him. She was embarrassed by having slept with Berrios after recently breaking up with her boyfriend. Before she left, Big Bear gave B.P. a "friendly hug," and she said she would see Big Bear again the following week.

When interviewed by Officer Hanson on March 23, Big Bear stated that Berrios and B.P. had flirted throughout the night. Big Bear also implied that B.P.'s accusations were untrue. At trial, Big Bear admitted that he wanted to help Berrios and that he had been determined to help Berrios as much as possible when he spoke with Officer Hanson.

Tucker testified that she, Berrios, and Big Bear began drinking at 4:00 p.m. on March 21. She invited B.P. to the house. Tucker did not see B.P. drinking and denied that B.P. became intoxicated at Tucker's house. She saw no flirtation between B.P. and Berrios. B.P. spent her time talking on her cell phone and did not stay at the house for long. Tucker fell asleep on the living-room couch and slept through the night.

B.P. and her school counselor testified on the first day of trial. On the morning of the second day of trial, a juror asked the bailiff if she could be provided with Spanish interpretive services for the remainder of the trial. The bailiff notified the district court, and the district court decided to question the juror.

The juror was re-sworn. She stated that Spanish is her first language, but she understands English and was able to understand the witnesses. She explained that she had requested Spanish interpretive services because she had not understood "some words" of the previous day's testimony and desired to understand all of the upcoming testimony. In response to questioning from Berrios's trial counsel, the juror stated that she had not understood certain unspecified, large words from the previous day's testimony. In response

---

2. Berrios referred to B.P. as "[Tucker's] friend."

3. Big Bear referred to B.P. as a young blonde woman.

to questioning from the prosecutor, the juror stated that she also had not understood certain unspecified sentences.

Over Berrios's objection, the prosecutor asked that the juror be removed and the alternate seated in her place. The district court ruled:

> This juror has indicated she has not been able to understand some words and therefore some sentences; that she wants to hear it in Spanish too. And I see it as akin to a situation where a juror comes forward and says that they missed part of the testimony yesterday for whatever reason.
>
> We have an alternate; this is why we have alternates.... It is my opinion that it is necessary to excuse this juror from further service as she has indicated under oath she has not understood and does not understand portions of the testimony....

Berrios's counsel agreed with the district court that the juror should not start to receive foreign-language interpretive services in the middle of trial, but he argued that the juror should continue her service without an interpreter. The district court reiterated that the juror would be excused. The district court excused the juror, thanked her for her candor, and advised her that foreign-language interpretive services could be arranged if she were called to serve as a juror in the future.[4]

The jury returned a guilty verdict on the charge of third-degree criminal sexual con-

duct, and the district court imposed a sentence of 48 months' imprisonment. This appeal followed.

## ISSUES

I. Did the district court abuse its discretion by removing a seated juror and replacing her with an alternate upon determining that the juror had not understood portions of the trial testimony because of a language barrier?

II. Was the evidence sufficient to support the guilty verdict?

III. Do appellant's pro se arguments have merit?

## ANALYSIS

### I.

Berrios argues that the district court abused its discretion by removing the juror because the juror understood the proceedings. Berrios also contends that the juror was removed because of her race. Berrios characterizes the juror's removal as structural error entitling him to a new trial.

■ We first address Berrios's argument as to the juror's ability to communicate in the English language. The Minnesota Rules of Criminal Procedure provide: "If a juror becomes unable to serve, an alternate juror must replace that juror." Minn. R.Crim. P. 26.02, subd. 9.[5] The

---

4. The Minnesota General Rules of Practice allow an interpreter appointed for a juror with a sensory disability to be present in the jury room to interpret during deliberations and voting, but we have found no Minnesota caselaw, statute, or rule addressing the appointment of a *foreign-language* interpreter for a juror. Minn. R. Gen. Pract. 8.12. The advisory-committee comment to rule 8.12 states that the rule presumably applies in "other, unusual, situations where such an in-

terpreter is appointed." Minn. R. Gen. Pract. 8.12 (2006) advisory comm. cmt.

5. The subdivision addressing alternate jurors was renumbered and amended effective January 1, 2010. The version in effect at the time of trial provided, in relevant part: "Alternate jurors ... shall replace jurors who prior to the time the jury retires to consider its verdict, become unable or disqualified to perform their duties." Minn. R.Crim. P. 26.02, subd. 8 (2008).

ability to communicate in the English language is one of several qualifications for jury service. Minn. R. Gen. Pract. 808(b)(4). A juror should be able to understand the evidence, the arguments of counsel, and the instructions of the district court; and a juror should be able to deliberate with other jurors. *See State v. Gaitan*, 536 N.W.2d 11, 16 (Minn.1995) (upholding peremptory strike of juror who "was having a very difficult time understanding a lot of the terms [being used]"); *State v. Ring*, 29 Minn. 78, 81–82, 11 N.W. 233, 235 (1882) (upholding district court's exclusion of prospective juror who did not have "knowledge of the [English] language as to enable him to understand the evidence, the argument of counsel, and the instructions of the court"); *The American Heritage Dictionary of the English Language* 383 (3d ed.1992) (defining "communicate" as "[t]o have an interchange, as of ideas").

■ A district court is in a superior position to that of an appellate court to assess a juror's ability to understand the English language. *See United States v. Gonzalez–Soberal*, 109 F.3d 64, 69 (1st Cir. 1997). Accordingly, we review a district court's factual determination as to a seated juror's ability to communicate in the English language for clear error. *See United States v. Campbell*, 544 F.3d 577, 581–82 (5th Cir.2008) (reviewing for clear error district court's factual determination that a seated juror was unable to communicate and participate in jury deliberative process because of his limited English skills), *cert. denied*, ─── U.S. ───, 129 S.Ct. 1019, 173 L.Ed.2d 308 (2009); *State v. Critt*, 554 N.W.2d 93, 95 (Minn.App.1996) (stating that district court's factual findings are subject to a clearly erroneous standard of review), *review denied* (Minn. Nov. 20, 1996). "Findings are clearly erroneous only if the reviewing court is left with the definite and firm conviction that a mistake has been made." *State v. Verdon*, 757 N.W.2d 879, 883 (Minn.App.2008) (quotation omitted), *review denied* (Minn. Feb. 25, 2009).

■ Here, the district court, Berrios's counsel, and the prosecutor examined the juror under oath with regard to her ability to understand the proceedings. The juror agreed that she had not understood "some parts of the testimony ... because of a language barrier." She stated that she was confused about the meaning of certain unspecified words and about the meaning of certain unspecified sentences. The district court's finding that the juror was unable to understand portions of the trial testimony because of a language barrier is well supported by the record and, therefore, not clearly erroneous.

■ In the context of these facts, we next consider whether the district court abused its discretion by removing the juror and replacing her with the alternate. *See State v. Manley*, 664 N.W.2d 275, 284–85 (Minn.2003) (reviewing district court's decision to remove a seated juror for abuse of discretion). The Minnesota Rules of Criminal Procedure provide that, if a juror becomes unable or disqualified to perform his or her duties, an alternate juror must replace that juror. Minn. R.Crim. P. 26.02, subd. 9. In light of this dispositive authority, the district court did not abuse its discretion by removing the seated juror and replacing her with an alternate. *See Manley*, 664 N.W.2d at 283–85 (concluding that it was within district court's discretion to remove a seated juror after concerns about juror's impartiality arose during trial).

■ For the first time on appeal, Berrios argues that the juror's removal raises the inference of racial discrimination. *See* Minn.Stat. § 593.32, subd. 1 (2008) (pro-

hibiting the exclusion of a citizen from jury service on account of, among other attributes, race, color, or national origin). Berrios has forfeited this issue by not addressing it with the district court. *See State v. Sorenson,* 441 N.W.2d 455, 457 (Minn. 1989) ("Usually, we will not decide issues which are not first addressed by the [district] court and are raised for the first time on appeal even if the issues involve constitutional questions regarding criminal procedure."). Moreover, in the absence of an adequate record as to the juror's race and the racial composition of the jury, we could not consider this argument on the merits. *See White v. Minn. Dep't of Natural Res.,* 567 N.W.2d 724, 734 (Minn.App. 1997) (stating that error is never presumed on appeal), *review denied* (Minn. Oct. 31, 1997).

■ Because the district court did not abuse its discretion by removing the juror and replacing her with an alternate, we do not reach Berrios's contention that the removal of the juror was structural error entitling him to a new trial. But we observe that, although depriving a criminal defendant of the right to an impartial jury is structural error, *State v. Dorsey,* 701 N.W.2d 238, 252–53 (Minn.2005), Berrios does not argue, nor is there an evidentiary basis to do so, that the alternate juror was biased.

## II.

■ Berrios challenges the sufficiency of the evidence supporting his conviction. When we consider such a challenge, our review is limited to a careful analysis of the record to determine whether the evidence, when viewed in the light most favorable to the verdict, was sufficient to permit the jury to reach a guilty verdict. *State v. Webb,* 440 N.W.2d 426, 430 (Minn. 1989). In doing so, we assume that the jury believed the evidence supporting the

verdict and disbelieved any evidence to the contrary. *State v. Moore,* 438 N.W.2d 101, 108 (Minn.1989). We will not disturb the verdict if the jury, acting with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, reasonably could conclude that the defendant is guilty of the charged offense. *Bernhardt v. State,* 684 N.W.2d 465, 476–77 (Minn.2004).

"A person who engages in sexual penetration with another person is guilty of criminal sexual conduct in the third degree if ... the actor knows or has reason to know that the complainant is ... physically helpless[.]" Minn.Stat. § 609.344, subd. 1(d). " 'Physically helpless' means that a person is (a) asleep or not conscious, (b) unable to withhold consent or to withdraw consent because of a physical condition, or (c) unable to communicate nonconsent and the condition is known or reasonably should have been known to the actor." Minn.Stat. § 609.341, subd. 9 (2008). "Consent" is defined as "words or overt actions by a person indicating a freely given present agreement to perform a particular sexual act with the actor." *Id.,* subd. 4 (2008).

Berrios does not dispute that he engaged in sexual penetration with B.P. Indeed, B.P.'s testimony alone is sufficient evidence to prove this element of the offense. *See* Minn.Stat. § 609.347, subd. 1 (2008) (providing that complainant's testimony need not be corroborated in criminal-sexual-conduct prosecution). Rather, Berrios contends that the state failed to prove beyond a reasonable doubt that B.P. was physically helpless. Specifically, Berrios argues that B.P. was not physically helpless because (1) B.P. "did in fact withhold her consent during the incident"; (2) she was able to remember certain details about the incident; and (3) there is evidence that B.P. consented to sex with

Berrios. We address each argument in turn.

When viewed in the light most favorable to the conviction, the evidence of B.P.'s physical helplessness is as follows. B.P. was extremely intoxicated, speaking incoherently, and vomiting. She required physical assistance from Berrios and Hurley to go from the car to an upstairs bedroom. After being placed on the bed, B.P. lost consciousness. She awoke to discover Berrios removing her pants and told him "no" before passing out again. When she next awoke, Berrios was on top of her and his penis was in her vagina. B.P. vomited, could not move her body, and "kept passing out."

Citing *State v. Blevins*, 757 N.W.2d 698 (Minn.App.2008), Berrios argues that B.P. was not physically helpless as a matter of law because she vocally objected to being undressed by him. Berrios's reliance on *Blevins* is unavailing. In *Blevins*, the complainant was intoxicated but able to walk. 757 N.W.2d at 699. She did not lose consciousness or fall asleep. *Id.* The complainant told the defendant that she did not want him to perform oral sex on her before the defendant did so and then engaged in sexual intercourse with her. *Id.* But because she felt ill, uncomfortable, and afraid, the complainant "just let it happen" and "waited for it to be over." *Id.* The *Blevins* court held that the evidence was insufficient to demonstrate that the complainant was unable to withhold or withdraw her consent because the complainant told the defendant that she did not consent to the sexual encounter. *Id.* at 701.

*Blevins* is not dispositive, however, because the facts are distinguishable from those presented here. In *Blevins*, the complainant was not asleep or unconscious during the sexual encounter. *See id.* at 700. Here, B.P. testified that, when Berr-

ios penetrated her, she was unconscious. Thus, there is ample evidentiary support for the jury's determination that B.P. was physically helpless. *See* Minn.Stat. § 609.341, subd. 9 (stating that a sleeping or unconscious person is physically helpless); *State v. Perkins*, 395 N.W.2d 729, 730–32 (Minn.App.1986) (concluding that evidence was sufficient to sustain conviction based on complainant's physical helplessness after complainant woke from sleep to find defendant engaging in sexual intercourse with her); *State v. Taylor*, 365 N.W.2d 368, 368–69 (Minn.App.1985) (same), *review denied* (Minn. June 14, 1985).

Berrios also argues that B.P. was not physically helpless because she was able to recall certain details about the night in question and about the sexual encounter. But there are also gaps in B.P.'s memory. Those gaps are consistent with the testimony that B.P. was severely intoxicated and experienced intermittent periods of unconsciousness.

Finally, Berrios argues that B.P. consented to sexual intercourse with him. To advance this argument, he relies on Big Bear's testimony that B.P. made loud, repetitive sexual remarks while upstairs with Berrios. But this argument improperly invites us to invade the exclusive province of the jury—judging witness credibility. *See Moore*, 438 N.W.2d at 108 (stating that reviewing court must assume that jury believed state's witnesses and disbelieved any evidence to the contrary). In fulfilling its obligation to judge witness credibility, the jury was free to discredit Big Bear's testimony and find B.P.'s testimony credible. B.P. testified that she did not consent to sexual activity with Berrios and that he penetrated her while she was unconscious. In judging the sufficiency of the evidence, we must assume that the jury accepted B.P.'s account as credible.

■ Although Berrios does not expressly contend that the state failed to prove that he knew or had reason to know of B.P.'s helplessness, such a challenge is implicit in his argument that B.P. was not physically helpless. Here, B.P. testified that she had a mixed drink and several shots of rum in Berrios's presence. She was "falling down drunk," vomited several times, lost consciousness more than once, and could not walk without assistance. She also testified that she passed out in Berrios's presence after telling him "no" and was unconscious when he penetrated her. Hurley, the only witness who had not been drinking, testified that Berrios helped carry B.P. into the house, where she vomited, and then helped carry her into an upstairs bedroom. From this testimony alone, there was ample evidence for the jury to conclude that Berrios knew or had reason to know that B.P. had been rendered physically helpless by her alcohol consumption.

Because we conclude that there is more than sufficient evidence in support of the jury's verdict, this aspect of Berrios's challenge also fails.

### III.

Berrios has submitted a pro se supplemental brief in which most of his pro se arguments also challenge the sufficiency of the evidence. We reject these arguments for the reasons discussed in Section II.

■ Berrios's remaining argument is that the district court abused its discretion by allowing testimony as to statements Berrios made in an interview by law-enforcement officers because the statements were inaccurately translated. The defendant bears the burden of proving the inadequacy of a translation. *State v. Sanchez–Diaz*, 683 N.W.2d 824, 835 (Minn. 2004). When evaluating the translation of testimony, we consider whether the trans-

lation was "on the whole adequate and accurate." *Id.* (quotation omitted). We decline to reach the merits of this argument, however, because it has not been adequately briefed. Berrios merely asserts that unspecified translation errors were made. *See State by Humphrey v. Modern Recycling, Inc.*, 558 N.W.2d 770, 772 (Minn.App.1997) (stating that assignment of error in brief based on "mere" assertion and not supported by argument or authority is waived (quotation omitted)). Without more, we are unable to evaluate the merit of this argument on appeal.

### DECISION

The district court's determination that the seated juror had not understood portions of the testimony because of a language barrier is amply supported by the record. Accordingly, the district court did not abuse its discretion by removing the juror and replacing her with an alternate. Appellant's challenge to the sufficiency of the evidence to support the jury's verdict fails. And we decline to consider appellant's challenge to his conviction based on a claim of unspecified translation errors in the absence of any argument identifying factual support and legal authority for the relief he seeks.

**Affirmed.**