*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0928**

State of Minnesota,
Respondent,

vs.

Alphonse Reff, Jr.,
Appellant.

**Filed May 23, 2016
Affirmed
Hooten, Judge**

Dakota County District Court
File No. 19HA-CR-14-2226

Lori Swanson, Attorney General, St. Paul, Minnesota; and

James C. Backstrom, Dakota County Attorney, Heather Pipenhagen, Assistant County Attorney, Hastings, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Julie Loftus Nelson, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Hooten, Presiding Judge; Larkin, Judge; and Rodenberg, Judge.

**U N P U B L I S H E D   O P I N I O N**

**HOOTEN**, Judge

On appeal from his two convictions of third-degree criminal sexual conduct, appellant argues that the evidence was insufficient to support the jury's findings that he

had a "significant relationship" with the victim and that he knew or had reason to know that the victim was "physically helpless." Because the evidence was sufficient to support both convictions, we affirm.

**FACTS**

Appellant Alphonse Reff, Jr., was charged with two counts of third-degree criminal sexual conduct and one count of second-degree controlled substance crime arising out of an incident on June 22, 2014. A jury trial was held in October 2014. The following facts were established at trial.

In June 2014, sixteen-year-old E.N. lived with her mother, S.N., in Apple Valley. On June 22, 2014, when E.N. returned home from her job at about 2:15 a.m., S.N. and Reff, her boyfriend of more than a year, were there. E.N. went to her mother's bedroom, where S.N. and Reff were drinking alcohol and smoking crack cocaine. S.N. and Reff shared some of the alcohol and crack cocaine with E.N. After smoking the crack cocaine, the three of them went to the garage and smoked marijuana.

Reff, S.N., and E.N. then drove to Coon Rapids to buy more crack cocaine. On the way home, E.N. and Reff smoked some of the crack cocaine that they had bought. When they returned to the house, all three smoked more crack cocaine, first downstairs in the living room and then upstairs in S.N.'s bedroom. Throughout the night, in order to enhance the drug's effect, the three gave each other "backs," where a person who has just smoked crack cocaine blows the smoke into another's mouth, and "chest pushes," where one person pushes with his or her hands on another's chest. When the crack cocaine was gone, S.N. went to bed, and E.N. went back downstairs to the living room to relax.

2

Soon after E.N. went downstairs, Reff came downstairs and told her that he had found more crack cocaine. Sitting on a couch, E.N. and Reff smoked the crack cocaine and continued to give each other backs and chest pushes. E.N. testified that in the course of these activities, Reff unhooked her bra under her shirt and stuck his tongue in her mouth. Reff took his penis out of his pants and "kind of started playing with it." He then placed E.N.'s hand on his penis. E.N. smoked more crack cocaine, and Reff took off her shirt and bra and pulled her sweatpants down below her knees. Reff moved to the floor in front of E.N. and initiated oral sex on her. He then stood up, had E.N. slide down on the couch, and began to have sexual intercourse with her. The intercourse lasted a few minutes, at which point E.N. told Reff to stop because she heard S.N. upstairs. Reff said, "It's okay," and continued the intercourse, but eventually stopped because S.N. came downstairs and began to yell at Reff. S.N. had woken up, gone downstairs, and found E.N. sitting on the couch, "completely naked," with Reff "standing over her." S.N. saw that E.N.'s legs were spread apart and that Reff was standing between her legs. S.N. observed that Reff had his pants on but, because she viewed him from behind, she could not tell whether his penis was out of his pants. S.N. and Reff then went upstairs together. Later that day, E.N. reported to her girlfriend what had happened, which eventually led to the incident being reported to the police.

The jury found Reff guilty of all three charged offenses, and Reff was sentenced. This appeal followed, in which Reff challenges only his two convictions of third-degree criminal sexual conduct.

## DECISION

When reviewing the sufficiency of the evidence, we undertake

> a painstaking analysis of the record to determine whether the evidence, when viewed in the light most favorable to the conviction, was sufficient to permit the jurors to reach the verdict which they did. We assume the jury believed the [s]tate's witnesses and disbelieved any evidence to the contrary. And we will not disturb the verdict if the jury, acting with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, could reasonably conclude that the defendant was guilty of the charged offense.

*State v. Ortega*, 813 N.W.2d 86, 100 (Minn. 2012) (quotation and citations omitted).

## I.

Reff argues that the evidence was insufficient to support the jury's finding that he had a significant relationship with E.N. because the state did not prove that Reff resided intermittently or regularly with E.N. at the time of the incident.

A person is guilty of third-degree criminal sexual conduct under Minn. Stat. § 609.344, subd. 1(f) (2012), if the person engages in sexual penetration with a complainant who is 16 or 17 years of age while having a "significant relationship" with the complainant. A "[s]ignificant relationship" exists when the defendant is "an adult who jointly resides intermittently or regularly in the same dwelling as the complainant and who is not the complainant's spouse." Minn. Stat. § 609.341, subd. 15(3) (2012). This court settled on definitions of "reside," "dwelling," and "intermittently" in *State v. Sebasky*, 547 N.W.2d

4

93, 100 (Minn. App. 1996), *review denied*, (Minn. June 19, 1996).[1] "To reside means to live, dwell, abide, sojourn, stay, remain, lodge . . . [or] have a settled abode for a time." *Id.* (quotation omitted). "A dwelling is any place of residence." *Id.* (quotation omitted). "Intermittently" means with intermissions or at intervals. *Id.*

Reff argues that he did not reside intermittently with E.N. because he had his own home, stayed at S.N.'s house only "occasionally" with no set schedule, did not keep any clothing at S.N.'s house, and did not receive mail there.[2] The state argues that the evidence was sufficient to support the jury's finding that Reff intermittently resided in the same dwelling as E.N. because Reff "regularly" stayed overnight at S.N.'s house, had his own garage door opener, and kept toiletries there.

We conclude that the evidence was sufficient for the jury to conclude that Reff jointly resided intermittently in the same dwelling as E.N. According to E.N., Reff "was at the house fairly frequently," and it was "normal" for him to be there. Both E.N. and S.N. testified that Reff occasionally stayed overnight at the house, sometimes for more than one night in a row. E.N. testified that he sometimes stayed there "for the weekend." S.N. testified that Reff had no regular schedule when he would stay at her house, although if

---

[1] The definition of "[s]ignificant relationship" in Minn. Stat. § 609.341, subd. 15, is unchanged since *Sebasky* was decided.

[2] Reff additionally points out his lack of closeness with E.N.: they were not close and did not spend much time together, and E.N. did not know Reff's last name until the investigation into this case began. However, the definition of "significant relationship" does not require a close relationship to exist between the defendant and the complainant. *See* Minn. Stat. § 609.341, subd. 15(3). Reff further notes that he was not responsible for E.N. and never disciplined her. But, an authority or disciplinary role is also not part of the definition of "significant relationship." *See id.*

Reff had to work at a certain job, he would sometimes stay at her house because of his commute. E.N. testified that Reff was sometimes at her house when S.N. was not home. Both E.N. and S.N. testified that while Reff did not keep clothes at the house, he kept some toiletries there. E.N. additionally stated that Reff would usually bring an overnight bag and once or twice had brought a kennel for his dog. S.N. testified that Reff had a garage door opener for her home, but did not receive mail there or leave any clothes there. E.N. testified that she had driven Reff's car sometime before the June 2014 incident.

In *Sebasky*, one complainant stayed overnight at the defendant's apartment "almost every weekend." *Id.* at 96. Another complainant stayed overnight "70–80% of the time when he was working for [the defendant] and as many as 6 nights per week during the summer" and kept clothes at the defendant's apartment. *Id.* This court concluded that "[t]he complainants' frequent, but discontinuous, stays of two to six days at a time are specifically covered by the statute's use of the term 'intermittently.'" *Id.* at 100.

While the facts here show more limited joint residence than the extensive amount of time that the actor and complainants jointly resided in *Sebasky*, the defendants in both cases resided frequently, though not continuously, with the complainants. The evidence presented at trial and the reasonable inferences to be drawn from that evidence were sufficient to permit the jury to find that Reff's presence at E.N.'s house constituted intermittent joint residence under the definitions set forth in *Sebasky*. Accordingly, there was sufficient evidence to find that Reff had a significant relationship to E.N. and to sustain his conviction under Minn. Stat. § 609.344, subd. 1(f).

6

**II.**

Reff next argues that the evidence was insufficient to support the jury's finding that he knew or had reason to know that E.N. was physically helpless "where E.N. appeared to be a willing participant and only objected to Reff's actions when she heard [S.N.] coming down the stairs." The state acknowledges that E.N. was eventually able to tell Reff to stop, but argues that she was physically helpless because she was unable to move and that Reff had reason to know that she was physically helpless.

A person is guilty of third-degree criminal sexual conduct under Minn. Stat. § 609.344, subd. 1(d) (2012), if the person engages in sexual penetration with another and "knows or has reason to know that the complainant is . . . physically helpless." "'Physically helpless' means that a person is (a) asleep or not conscious, (b) unable to withhold consent or to withdraw consent because of a physical condition, or (c) unable to communicate nonconsent and the condition is known or reasonably should have been known to the actor." Minn. Stat. § 609.341, subd. 9 (2012). "'Consent' means words or overt actions by a person indicating a freely given present agreement to perform a particular sexual act with the actor." *Id.*, subd. 4(a) (2012).

Two contrasting cases illustrate the meaning of "physically helpless" under the definition in Minn. Stat. § 609.341, subd. 9. In *State v. Blevins*, the complainant had consumed 10 to 12 alcoholic beverages and was "pretty drunk" when she was assaulted. 757 N.W.2d 698, 699 (Minn. App. 2008). Blevins offered the complainant oral sex, but she told Blevins multiple times that she did not want oral sex. *Id.* Despite her protests, Blevins initiated oral sex on the complainant and then had sexual intercourse with her. *Id.*

7

Because the complainant "felt stuck, uncomfortable, and afraid, she 'just let it happen' and 'waited for it to be over.'" *Id.* Blevins was convicted of two counts of third-degree criminal sexual conduct for engaging in sexual penetration with a physically helpless victim, in violation of Minn. Stat. § 609.344, subd. 1(d) (2002). *Id.* This court reversed the conviction because the complainant had verbally expressed to Blevins that she did not consent to the sexual penetration. *Id.* at 701. Therefore, "the evidence [was] insufficient to demonstrate that she was unable to withhold or withdraw her consent." *Id.*

In *State v. Berrios*, the complainant consumed several alcoholic drinks in the presence of Berrios and became so intoxicated that she had memory gaps, vomited, and passed out. 788 N.W.2d 135, 137 (Minn. App. 2010), *review denied* (Minn. Nov. 16, 2010). The complainant was helped into a house and placed on a bed in an upstairs bedroom. *Id.* The next thing that the complainant remembered was Berrios pulling down her pants. *Id.* She told Berrios "no" and then passed out again. *Id.* She eventually woke up vomiting and discovered that Berrios was having sexual intercourse with her. *Id.* She could not move her body and kept passing out. *Id.* This court affirmed Berrios' conviction under Minn. Stat. § 609.344, subd. 1(d) (2008), because the complainant was unconscious at the time of the sexual penetration and thus was physically helpless. 788 N.W.2d at 142–43.

This case falls somewhere between *Blevins* and *Berrios*. This case is similar to *Blevins* in that the complainant was aware of what was happening, but it is distinguishable because, while the complainant in *Blevins* was able to communicate nonconsent, E.N. testified that she felt "frozen" and not in control of her body. This is more similar to what

8

the complainant in *Berrios* experienced. *See id.* at 142 (noting that, in addition to passing in and out of consciousness, complainant "could not move her body"). And, unlike the complainant in *Blevins*, E.N. did not tell Reff to stop *before* Reff engaged in sexual penetration with her. *See* 757 N.W.2d at 699 (indicating that complainant told Blevins to stop before Blevins initiated sexual penetration). Earlier in her testimony, E.N. stated that smoking crack cocaine gave her the experience of a mind-body split: "It's like there was my body and I wasn't really controlling my body, I was just living inside of it, like my body could do something and my mind didn't really have control." E.N. also testified that she felt frozen when Reff was having sexual intercourse with her and that she did not want to have sex with Reff. In addition, at that time, she was menstruating. She testified that she normally would not have allowed someone to initiate oral sex on her when she was menstruating. When S.N. came downstairs and confronted Reff, E.N. still felt frozen and could not move. She explained that "[she] couldn't do anything so [she] was like just sitting there completely naked" on the couch with her legs spread open. This evidence was sufficient to have allowed the jury to conclude that E.N. was physically helpless at the time of the sexual penetration and that because of the effects of the drugs and alcohol, she was unable to withhold consent or to withdraw consent due to a physical condition.

However, to be convicted under Minn. Stat. § 609.344, subd. 1(d), the defendant must also know or have reason to know that the complainant is physically helpless. Reff argues that he did not know or have reason to know that E.N. was physically helpless because she did not object when he undressed her and, when Reff motioned for her to do so, E.N. moved on the couch before he initiated sexual intercourse. The state argues that

9

Reff was a crack cocaine user and "presumably would understand that his tolerance to this drug was greater than that of a 16-year-old girl."

Because there is no direct evidence of Reff's knowledge about E.N.'s physical state, we apply the two-step circumstantial evidence test. *See State v. Silvernail*, 831 N.W.2d 594, 598 (Minn. 2013). "The first step is to identify the circumstances proved. In identifying the circumstances proved, we defer to the jury's acceptance of the proof of these circumstances and rejection of evidence in the record that conflicted with the circumstances proved by the State." *Id.* at 598–99 (quotations and citation omitted). In other words, "we consider only those circumstances that are consistent with the verdict. This is because the jury is in the best position to evaluate the credibility of the evidence even in cases based on circumstantial evidence." *Id.* at 599 (citation omitted). "The second step is to determine whether the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis except that of guilt." *Id.* (quotations omitted).

The evidence at trial indicates that Reff smoked crack cocaine with E.N. on five occasions during an approximately three- to four-hour period. On more than one of these occasions, Reff and E.N. gave each other backs and chest pushes in order to enhance the effects of the crack cocaine. The evidence at trial also indicates that, in Reff's presence, E.N. consumed alcohol and smoked marijuana. E.N. testified that the date of the incident was only the second time that she had smoked crack cocaine and that, when she first smoked crack cocaine, she was also with S.N. and Reff. E.N. and S.N. both testified that the high from crack cocaine is immediate. Viewing the evidence in the light most favorable to the verdict, these circumstances proved are consistent with guilt because, immediately

10

after smoking crack cocaine with E.N. in the living room, Reff, as an experienced user of crack cocaine, either knew or had reason to know that the high from such a quantity of recently ingested crack cocaine, combined with other substances, by a sixteen-year-old girl with limited experience with crack cocaine would cause her to be "unable to withhold consent or to withdraw consent because of a physical condition."[3]  Minn. Stat. § 609.341, subd. 9.

Here, the circumstances proved are inconsistent with any rational hypothesis of innocence.  The theory that Reff did not know how high E.N. was, or that he thought that she was functioning normally and was not physically helpless, is unreasonable in light of all the evidence.  Accordingly, there was sufficient evidence to sustain Reff's conviction under Minn. Stat. § 609.344, subd. 1(d).

**Affirmed.**

---

[3] E.N.'s testimony was somewhat conflicting as to the physical effect of the drug on her: she testified about not being in control of her body due to the crack and about feeling frozen at the time of the sexual penetration by Reff, but she also testified about her own physical acts—smoking crack and moving on the couch—just before the sexual penetration. However, "a trier of fact is free to accept part and reject part of a witness's testimony." *Coker v. Jesson*, 831 N.W.2d 483, 492 (Minn. 2013).  Because "we consider only those circumstances that are consistent with the verdict," we do not consider the circumstances of some of E.N.'s physical acts, as well as her testimony that she told Reff to stop when she heard S.N. coming, in evaluating the sufficiency of the evidence of Reff's knowledge under the circumstantial evidence test.  *See Silvernail*, 831 N.W.2d at 599.

11