*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A22-1753**

State of Minnesota,
Respondent,

vs.

Blas Garcia,
Appellant.

**Filed December 11, 2023**
**Affirmed**
**Reyes, Judge**

Otter Tail County District Court
File No. 56-CR-22-1330

Keith Ellison, Attorney General, Lisa Lodin Peralta, Assistant Attorney General, St. Paul, Minnesota; and

Michelle Eldien, Otter Tail County Attorney, Fergus Falls, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Jessica Merz Godes, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Bratvold, Presiding Judge; Reyes, Judge; and Smith, Tracy M., Judge.

**NONPRECEDENTIAL OPINION**

**REYES**, Judge

Appellant challenges his conviction of fourth-degree criminal sexual conduct, arguing that the state failed to prove beyond a reasonable doubt that the victim was

"mentally incapacitated" or "physically helpless" as required to sustain his conviction. We affirm.

**FACTS**

The following facts are taken from the testimony of A.T., S.A., and several officers. On June 10, 2022, 19-year-old A.T. attended a festival in Fergus Falls with some of her friends. After leaving that evening around 9:00 p.m., A.T. and her friends went to the apartment of S.A., a person A.T. had met earlier that day. Several people were at the apartment when A.T. and her friends arrived. While at the apartment, the group was drinking, hanging out, and listening to music, and people were coming and going. A.T. drank to the point of being "intoxicated but still cognizant of what was going on." At one point, A.T. and S.A. left to buy drinks, but ultimately returned to the apartment.

When A.T. and S.A. returned to the apartment, A.T.'s friends had left but there were two people still inside. A.T. did not know the remaining individuals, but S.A. recognized them as David Mills, who was one of his roommates, and appellant Blas Garcia, who lived in the building. Both S.A. and A.T. had misplaced their phones, and S.A. went into his room to look for his while A.T. stayed in the living room to look for hers.

A.T. eventually sat on the living room couch and started talking to appellant and Mills, who asked her if she wanted more to drink. Before she could answer, Mills tilted A.T.'s head back and poured alcohol down her throat while appellant sat next to A.T. on the couch. The alcohol "tasted like rubbing alcohol," was "very strong," and had a fully open top. A.T. testified that she does not normally consume alcohol but "had to drink because the alcohol was spilling down [her] chest and [her] neck" and she "was starting to

2

kind of drown." She consumed what "felt like a lot" over "maybe 30 seconds." After Mills stopped, A.T. quickly became intoxicated and experienced symptoms including impaired speech, difficulty focusing, and hindered movement.

Mills then sat in front of A.T. and put his hands on her. A.T. felt uncomfortable but "was also very intoxicated so there wasn't a lot of connection with [her] brain to [her] body." Mills began touching A.T.'s vagina and then stuck his fingers inside her, which A.T. found to be very painful. Mills had his hand over A.T.'s mouth, and her vision was "tunneled" on him. A.T. knew that someone was touching her breasts but "it was really hard to focus on [the breast touching] when [she] was in pain." A.T. was unable to say anything and was "kind of crying." One of the men asked A.T. if she wanted them to stop, but Mills kept his hand over A.T.'s mouth, and she "was really too drunk to respond anyways." Mills and appellant did not ask for A.T.'s consent before touching her, and A.T. did not want them to touch her. The touching lasted approximately 15 to 30 minutes, and A.T. was "making noise" during it.

While S.A. was in his room, he heard a noise "[l]ike a grunt" or "something muffled." He exited his room and saw Mills and appellant on top of A.T. and that "[Mills] was . . . performing oral sex [on] her," "[appellant] had his mouth on her breast," and "[Mills] had his hand on . . . her mouth." A.T. was "reclining on the couch" in a "sitting down but . . . slumped down" position. A.T. was completely naked. As S.A. "started screaming at them," Mills removed his hand from A.T.'s mouth, and A.T. immediately "said to stop" and asked S.A. for help. S.A. picked A.T. up, took her to a different part of

3

the room, and started putting her clothes on her. S.A. and A.T. then left the apartment and walked to a nearby bridge where they called the police.

Officers J.D. and R.F. of the Fergus Falls Police Department responded to the 911 call. Upon arrival, Officer J.D. observed A.T. crying hysterically and approached her. A.T. stood up, came towards Officer J.D., "kind of fell towards [him]," and stated "help me, help me" as she cried. Officer J.D. observed that A.T. seemed unsteady on her feet, smelled of alcohol, and appeared sticky. Officer J.D. interviewed A.T. about the incident at the apartment. Throughout the interview, A.T. alternated between a calm state and hysterically crying and showed symptoms of intoxication.

Officer R.F. spoke with S.A. about what took place at the apartment. Officer R.F. later took photographs at S.A.'s apartment, which showed that the living room table was covered in beer bottles and an open bottle of peach schnapps.

Respondent State of Minnesota charged appellant with one count of second-degree criminal sexual conduct under Minn. Stat. § 609.343, subd. 1(e)(i) (Supp. 2021) (count I), and one count of fourth-degree criminal sexual conduct under Minn. Stat. § 609.345, subd. 1(b) (Supp. 2021) (count II). Appellant pleaded not guilty to both counts.

After a two-day jury trial, the jury acquitted appellant of count I and found appellant guilty of count II. The district court sentenced appellant to 36 months in prison, stayed for ten years, and ordered appellant to serve 180 days in jail. This appeal follows.

**DECISION**

Appellant argues that the state provided insufficient evidence to prove beyond a reasonable doubt that A.T. was "mentally incapacitated" or "physically helpless" under Minn. Stat. § 609.345, subd. 1(b). We disagree.

Whether a defendant's conduct meets the definition of a particular offense presents a question of statutory interpretation that appellate courts review de novo. *State v. Hayes*, 826 N.W.2d 799, 803 (Minn. 2013). "In considering a claim of insufficient evidence, [an appellate] court's review is limited to a painstaking analysis of the record to determine whether the evidence, when viewed in the light most favorable to the conviction, is sufficient" to support the jury's verdict. *State v. Blevins*, 757 N.W.2d 698, 700 (Minn. App. 2008). The appellate court "must assume the jury believed the state's witnesses and disbelieved any contrary evidence." *Id*. "The reviewing court will not disturb the verdict if the jury, acting with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, could reasonably conclude that the defendant was guilty of the charged offense." *Id*.

To be found guilty of fourth-degree criminal sexual conduct under Minn. Stat. § 609.345, subd. 1(b), a defendant must have engaged "in sexual contact with another person" and must know or have reason to know "that the complainant is mentally impaired, mentally incapacitated, or physically helpless." Minn. Stat. § 609.345, subd. 1 (Supp. 2021).

**I.     The state presented sufficient evidence to prove beyond a reasonable doubt that A.T. was "mentally incapacitated."**

Appellant does not dispute that A.T. was involuntarily under the influence of alcohol but argues that the state failed to show that A.T. lacked the judgment to give a reasoned consent or that she was incapable of consenting or appreciating, understanding, or controlling her conduct. We are not persuaded.

"Mentally incapacitated" means

> (1)     that a person *under the influence of alcohol* . . . administered to that person without the person's agreement, *lacks the judgment to give a reasoned consent* to sexual contact or sexual penetration; or
> (2)     that a person is *under the influence of any substance* or substances *to a degree* that *renders them incapable of consenting* or *incapable of appreciating, understanding, or controlling the person's conduct*.

Minn. Stat. § 609.341, subd. 7 (Supp. 2021) (emphasis added). "Consent" is defined as "*words or overt actions* by a person indicating a freely given present agreement to perform a particular sexual act with the actor." *Id.*, subd. 4(a) (2020) (emphasis added).

First, the evidence supports a jury finding that A.T. lacked the judgment to give a reasoned consent. A.T. described feeling so intoxicated that there was a limited connection between her brain and body and that Mills touching her was "very painful" and made it difficult to focus. A.T. testified to "feeling very light and heavy at the same time" and that her "speech was impaired" and "[m]oving was a task." A.T. also told Officer J.D. that "[she] was so drunk, [she] could hardly tell what was going on," and that she did not know what time it was, the day, or the month. Officer J.D.'s interview with A.T. supports that, even after the incident, A.T. struggled to spell her own name or remember her birth date.

6

The state presented sufficient evidence for the jury to find that A.T. lacked the judgment to give reasoned consent to the sexual contact.

Second, the evidence also supports a jury finding that A.T.'s intoxication rendered her incapable of consenting or appreciating, understanding, or controlling her own conduct. A.T. told Officer J.D. that, during the incident, Mills kept asking her if she wanted him to stop, but that she could not respond because she was so drunk. A.T. also told Officer J.D. that she realized she "was being raped" but could not do anything about it and that she was too drunk to get up and walk away. Based on A.T.'s statements to Officer J.D., the jury could have reasonably found that A.T. was incapable of consenting or controlling her own conduct.

We conclude that the state provided sufficient evidence to support the jury's finding that A.T. was "mentally incapacitated."

**II.    The state presented sufficient evidence to prove beyond a reasonable doubt that A.T. was "physically helpless."**

Appellant argues that A.T. and S.A.'s testimony supports that A.T. was not asleep or unconscious at any time during the incident and that A.T. could have withheld or withdrawn consent or communicated nonconsent. Further, appellant argues that, although Mills's hand over A.T.'s mouth *prevented* her from communicating, it did not equate to A.T. being *unable* to communicate. We disagree.

"Physically helpless" means that

> a person is (a) asleep or not conscious, (b) unable to withhold consent or to withdraw consent because of a physical condition, or (c) unable to communicate nonconsent and the

7

condition is known or reasonably should have been known to the actor.

Minn. Stat. § 609.341, subd. 9 (2020).

Here, A.T. testified that she remembered only parts of the incident and that she had no memory of her clothes being removed. A.T. told Officer J.D. that she could not remember "how any of this happened." The jury could have reasonably found that A.T. was asleep or unconscious during parts of the incident.

Furthermore, the evidence also supports that A.T. was "unable to withhold consent or to withdraw consent because of a physical condition" and that she was "unable to communicate nonconsent."[1] Minn. Stat. § 609.341, subd. 9(b), (c). Even if Mills's hand had not been over her mouth, A.T. reported to Officer J.D. that she "was so drunk [she] could hardly tell what was going on." A.T. testified that, during the incident, she was unable to say anything and that she was too drunk to respond. The evidence supports the jury's findings that A.T. was unable to communicate, move, or do anything, even though she realized that Mills and appellant were "raping" her, and that A.T. was unable to communicate nonconsent.

Appellant's reliance on *Blevins* is misguided. In *Blevins*, we concluded that the state presented insufficient evidence that the complainant was physically helpless when she had verbalized her nonconsent to the appellant. 757 N.W.2d at 701. The complainant testified that, because she felt stuck, uncomfortable, and afraid, she "just let it happen" while

---

[1] Appellant does not argue that he did not know or have reason to know of A.T.'s inability to communicate nonconsent.

appellant performed oral sex on her and had sexual intercourse with her. *Id*. at 699. No such communication occurred here, and, as noted above, the evidence supports the jury finding that A.T. lost consciousness during the incident. *State v. Berrios* is more analogous to this case. 788 N.W.2d 135 (Minn. App. 2010), *rev. denied* (Minn. Nov. 16, 2010). In *Berrios*, we concluded that ample evidence supported that the victim was "physically helpless" when she was extremely intoxicated, speaking incoherently, vomiting, required physical assistance from others to go upstairs, could not move her body, and kept losing consciousness. *Id*. at 142. The victim had gaps in her memory consistent with severe intoxication and periods of unconsciousness. *Id*. Further, even though the victim withheld her consent to have intercourse with the appellant, the appellant penetrated her after she lost consciousness. *Id*.

Here, A.T. testified to being very intoxicated during the incident, she told Officer J.D. that she could not talk because she was so drunk, she was too drunk to get up and walk away, and she had gaps in her memory consistent with unconsciousness. Like *Berrios*, the evidence supports that A.T. was physically helpless during the sexual incident.

When viewing the evidence in the light most favorable to the conviction, the state provided sufficient evidence for the jury to find beyond a reasonable doubt that A.T. was both "mentally incapacitated" and "physically helpless" under Minn. Stat. § 609.345, subd. 1(b).

**Affirmed.**

9