# STATE OF MINNESOTA
# IN COURT OF APPEALS
# A23-0200

State of Minnesota,
Respondent,

vs.

David Alan Williams,
Appellant.

**Filed February 5, 2024**
**Affirmed in part, reversed in part, and remanded**
**Larson, Judge**

Hennepin County District Court
File No. 62-CR-20-6412

Keith Ellison, Attorney General, St. Paul, Minnesota; and

John J. Choi, Ramsey County Attorney, Peter Marker, Assistant County Attorney, St. Paul, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Rachel F. Bond, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Slieter, Presiding Judge; Cochran, Judge; and Larson, Judge.

## SYLLABUS

1.      Under Minn. Stat. § 609.341, subd. 3 (2016), the infliction of bodily harm alone constitutes "force;" the factfinder need not find that the infliction of bodily harm caused a victim to submit to penetration to meet the statutory definition.

2.   The exception to multiple convictions and sentences in Minn. Stat. § 609.035, subdivision 6, does not apply when the state charges alternative theories for committing a single act of criminal sexual conduct.

## OPINION

**LARSON**, Judge

Appellant David Alan Williams appeals from the district court's judgment of conviction finding him guilty of two counts of first-degree criminal sexual conduct. *See* Minn. Stat. § 609.342, subd. 1(e)(i) (2016) (force or coercion); *id.*, subd. 1(e)(ii) (2016) (mentally impaired, mentally incapacitated, or physically helpless). Williams challenges the sufficiency of the evidence supporting the jury's guilty verdict on both counts, and, in the alternative, argues the district court improperly convicted and sentenced him twice for the same offense. Because we conclude that respondent State of Minnesota presented sufficient evidence to support the jury's guilty verdict on both counts, we affirm in part. But because the district court improperly convicted and sentenced Williams twice for the same offense, we reverse in part and remand to the district court to vacate one of Williams's convictions and the corresponding sentence, while leaving the guilty verdicts intact.

## FACTS

We derive the following facts from the testimony presented at trial. In June 2018, S.S. moved into an apartment building in Saint Paul, Minnesota. At the time, Williams was the sales and marketing manager for the apartment building. A few days later, S.S. attended a going-away party for a member of the building's management team. At the

party, S.S. had at least two beers and some clear liquor that Williams poured into her second beer.

As the party wound down, Williams suggested that he, S.S., and a few others go to a nearby bar. S.S. testified that she felt "drunk" at this point. Worried about S.S., S.S.'s friend (first friend) joined the group heading to the bar. S.S. continued drinking at the bar. At some point, Williams kissed S.S., who pulled back from the kiss.

The group relocated to another bar to play pool. S.S. did not remember walking from the first bar to the second. Another friend (second friend) testified that S.S. was "very intoxicated" when she left the first bar, and second friend went to the second bar only to keep an eye on S.S. First friend testified that she, similarly, only went to the second bar to watch over S.S. First friend was very worried about S.S. and testified that the bartenders at the first bar also expressed concern for S.S. First friend described how, on the walk to the second bar, Williams had his hands all over S.S. and pulled S.S. in for a kiss, at which point S.S. "kind of shoved him off, but she was really drunk and stumbling, and he pulled her back in again."

At the second bar, first friend tried unsuccessfully to convince the bartender to stop serving S.S. Williams kept trying to kiss S.S., who told Williams multiple times that she was not going to sleep with him. Second friend described Williams as "really aggressively kissing" S.S. and testified that S.S. "was kind of struggling to stand up a little bit." First friend similarly described how Williams "was handsy and trying to kiss [S.S.], and she would push him away."

3

S.S. testified that she did not remember leaving the second bar and did not remember much of the walk back to the apartment building. S.S. did recall leaning on first friend for at least part of the walk home while Williams and second friend walked ahead. First friend described how she "half carried, half walked" S.S. home and asked S.S. if she was okay because Williams "seemed very handsy." Second friend testified that, during the walk home, Williams told him that the two women (S.S. and first friend) were "really drunk," and the two men (Williams and second friend) could "do whatever [they] want."[1]

When the group arrived at the apartment building, Williams entered through a side entrance, and second friend went through the main entrance, where he found S.S. and first friend waiting in the lobby. Both friends walked S.S. to her apartment and refused to leave until S.S. locked her door, which she did. But before S.S. went to bed, she heard a knock at the door and answered it to find Williams. S.S. testified that she did not believe she invited Williams in, but that she did not prevent him from entering the apartment.

S.S. testified that she was "very intoxicated" when Williams arrived at her apartment, and that her sole thought was to go to bed. S.S. remembered that shortly after Williams arrived, she specifically told him that she was not going to sleep with him. After changing her clothes, S.S. went to bed and recalled Williams was in the bed with her, but S.S. could not recall who got into her bed first. S.S. rolled over to face away from Williams and recalled him asking her questions as she drifted in and out of consciousness.

---

[1] Williams denied making the "do whatever [they] want" comment.

4

S.S. awoke to Williams pulling her onto her back. Williams pulled her shorts to the side and put his penis in her vagina. S.S. recalled feeling confused, feeling pain from the friction, and "a dizzying feeling." S.S. also testified that Williams made her feel afraid when she awoke to him on top of her, and she feared that if she fought back against Williams, he might seriously hurt her. S.S. described how she was "in and out" of consciousness, and Williams did not listen when she told him to stop. S.S. further testified that Williams pulled her on top of him and held her hips down while she tried to get off him. S.S. also recalled that Williams attempted to perform oral sex on her and bit her thighs and vagina. She remembered "very clearly it hurting and smacking his sweaty bald head and trying to push him away," but Williams only got more aggressive and made sure that S.S. could not push him off of her. S.S. remembered thinking "that maybe if he just finishes and gets whatever he was getting, then he'll stop and go away." The next thing she remembered was waking up the following morning.

S.S. eventually reported the incident to the two friends. S.S. expressed to first friend that she told Williams to stop, and showed first friend the bruises on her legs, which were starting to fade because they were over a week old. First friend described some of the bruises as "hickey-like" and others as "hand-print, fingerprint-type" bruises.

S.S. reported the alleged sexual assault to the police on December 16, 2019. The police interviewed Williams on July 3, 2020. On October 7, 2020, the state charged Williams with two counts of first-degree criminal sexual conduct. Count one charged Williams with criminal sexual conduct in the first degree under Minn. Stat. § 609.342, subd. 1(e)(ii), alleging that Williams sexually penetrated "and caused personal injury" to a

5

person he "knew or had reason to know" was "physically helpless." Count two charged Williams with criminal sexual conduct in the first degree under Minn. Stat. § 609.342, subd. 1(e)(i), alleging that Williams sexually penetrated "and caused personal injury" to a person and that Williams "used force or coercion to accomplish sexual penetration."

The case proceeded to trial. Williams testified in his own defense and contradicted much of the testimony presented by S.S. and the two friends. A jury found Williams guilty on both counts. The district court entered judgment of conviction on both counts and sentenced Williams to serve two concurrent 108-month prison terms—one for each count. Williams appeals.

## ISSUES

I. Was there sufficient evidence to support the jury's finding that S.S. was physically helpless and that Williams knew or should have known that she was physically helpless?

II. Was there sufficient evidence to support the jury's finding that Williams used force or coercion to accomplish sexual penetration?

III. Did the district court improperly convict and sentence Williams twice for the same offense?

## ANALYSIS

Williams challenges the sufficiency of the evidence supporting the jury's verdict on count one, arguing the state failed to prove S.S. was physically helpless or, even if she was physically helpless, that Williams knew or should have known that she was physically helpless. Williams also challenges the sufficiency of the evidence supporting the jury's

verdict on count two, arguing that the state failed to prove that he used force or coercion. Finally, Williams argues in the alternative that we must reverse and remand to the district court to vacate one conviction and corresponding sentence because the district court improperly convicted and sentenced Williams twice for the same offense. We address Williams's sufficiency challenges in part I, and the conviction and sentencing issue in part II.

**I.**

Williams argues the state presented insufficient evidence to sustain his convictions for both counts. "When evaluating the sufficiency of the evidence, appellate courts 'carefully examine the record to determine whether the facts and the legitimate inferences drawn from them would permit the jury to reasonably conclude that the defendant was guilty beyond a reasonable doubt of the offense of which he was convicted.'" *State v. Griffin*, 887 N.W.2d 257, 263 (Minn. 2016) (quotation omitted). "The evidence must be viewed in the light most favorable to the verdict, and it must be assumed that the fact-finder disbelieved any evidence that conflicted with the verdict." *Id.* "The verdict will not be overturned if the fact-finder, upon application of the presumption of innocence and the State's burden of proving an offense beyond a reasonable doubt, could reasonably have found the defendant guilty of the charged offense." *Id.*

The state may prove its case using either direct or circumstantial evidence. *State v. Olson*, 982 N.W.2d 491, 495 (Minn. App. 2022). "Direct evidence is evidence based on personal knowledge or observation that, if true, proves a fact without inference." *State v. Olson*, 887 N.W.2d 692, 700 (Minn. App. 2016) (citing *Bernhardt v. State*, 684 N.W.2d

465, 477 n.11 (Minn. 2004)). When the state supports an element with direct evidence, we painstakingly review "the record to determine whether the evidence, when viewed in a light most favorable to the conviction, was sufficient to permit the jurors to reach the verdict which they did." *State v. Horst*, 880 N.W.2d 24, 40 (Minn. 2016) (quotation omitted).

Circumstantial evidence is "evidence from which the factfinder can infer whether the facts in dispute existed or did not exist." *State v. Harris*, 895 N.W.2d 592, 599 (Minn. 2017) (quotation omitted). We apply a heightened two-step standard when reviewing the sufficiency of circumstantial evidence. *State v. Ortega*, 813 N.W.2d 86, 100 (Minn. 2012). First, we "identify the circumstances proved." *State v. Silvernail*, 831 N.W.2d 594, 598 (Minn. 2013). In this step, "we defer to 'the jury's acceptance of the proof of these circumstances'" and "assume that the jury believed the State's witnesses and disbelieved the defense witnesses." *Id.* at 598-99 (quotations omitted). Second, we determine if the circumstances proved, when viewed in their entirety "are 'consistent with guilt and inconsistent with any rational hypothesis except that of guilt,'" and "not simply whether the inferences that point to guilt are reasonable." *Id.* at 599 (quotation omitted). During this step, we do not defer "to the factfinder's choice between reasonable inferences." *State v. Andersen*, 784 N.W.2d 320, 329-30 (Minn. 2010) (quotation omitted). The circumstantial evidence the state presents "must form a complete chain that, in view of the evidence as a whole, leads so directly to the guilt of the defendant as to exclude beyond a reasonable doubt any reasonable inference other than guilt." *State v. Al-Naseer*, 788 N.W.2d 469, 473 (Minn. 2010) (quotation omitted).

8

### A.    Count One—Minn. Stat. § 609.342, subd. 1(e)(ii)

Williams first challenges whether the state presented sufficient evidence to sustain the jury's verdict on count one.  Under Minn. Stat. § 609.342, subd. 1(e)(ii):

> A person who engages in sexual penetration with another person . . . is guilty of criminal sexual conduct in the first degree if . . . the actor causes personal injury to the complainant, and . . . the actor knows or has reason to know that the complainant is mentally impaired, mentally incapacitated, or physically helpless.

Accordingly, to convict Williams, the state needed to prove: (1) Williams sexually penetrated S.S.; (2) Williams caused personal injury to S.S.; and (3) Williams knew or had reason to know that S.S. was "mentally impaired, mentally incapacitated, or physically helpless."[2]  Williams argues the state failed to prove beyond a reasonable doubt that S.S. was physically helpless, and further argues that, even if S.S. was physically helpless, the state failed to prove that Williams knew or should have known that S.S. was physically helpless.  We address each argument in turn.

#### 1.    Physically Helpless

Williams argues the evidence shows that S.S. was not physically helpless because she was able to open her apartment door for Williams, talked to him, changed her clothing unassisted, got into bed, awoke when Williams rolled her onto her back, and then repeatedly verbalized her nonconsent during the sexual encounter.  Williams acknowledges that S.S. testified that she was in and out of consciousness during the sexual encounter, but

---

[2] Williams does not contest that the state presented sufficient evidence on the first two elements.

discredits this testimony, saying that the weight of the evidence shows that "on the whole, [S.S.] was awake and conscious." We apply the direct-evidence test to this issue because testimony from a complainant is direct evidence. *See, e.g.*, *State v. Epps*, 949 N.W.2d 474, 487 ("Testimony provided by a witness, concerning what the witness saw or heard, is considered direct evidence . . . .") (Minn. App. 2020), *aff'd*, 964 N.W.2d 419 (Minn. 2021).

Under Minn. Stat. § 609.341, subd. 9 (2016), a person is "physically helpless" when they are: "(a) asleep or not conscious, (b) unable to withhold consent or to withdraw consent because of a physical condition, or (c) unable to communicate nonconsent and the condition is known or reasonably should have been known to the actor." As relevant here, the jury found S.S. met the physically helpless definition because she was intermittently "asleep or not conscious" during the sexual encounter.[3]

This case is akin to *State v. Berrios*, in which the complainant's testimony showed that she "was extremely intoxicated," fell unconscious, and "awoke to discover [the defendant] removing her pants." 788 N.W.2d 135, 142 (Minn. App. 2010), *rev. denied* (Minn. Nov. 16, 2010). The complainant told the defendant "no" but passed out again and awoke to find the defendant "on top of her" with his penis inside her vagina. *Id.* During

---

[3] On a special-verdict form, the jury found S.S. met all three definitions of physically helpless. Because we conclude the state presented sufficient evidence to prove S.S. was "asleep or not conscious," we do not analyze whether the state presented sufficient evidence to meet the other two grounds. *See Epps*, 949 N.W.2d at 482 (addressing alternative means of committing first-degree criminal sexual conduct and explaining "the state need not prove that both [alternative means] were used for our court to sustain a conviction"); *State v. St. Claire*, No. A17-1003, 2018 WL 2293334, at *3 (Minn. App. May 21, 2018), *rev. denied* (Minn. Aug. 7, 2018) (concluding the evidence was sufficient to support the conviction based on one statutory definition and therefore declining to consider the sufficiency of the evidence regarding an alternative statutory definition).

10

the encounter, the complainant "could not move her body, and 'kept passing out.'" *Id.* Despite Berrios's argument that the complainant "was not physically helpless because she was able to recall certain details about . . . the sexual encounter," we concluded that sufficient evidence showed the complainant was physically helpless because she was asleep or unconscious. *Id.* We reasoned that the complainant's testimony regarding gaps in her memory was "consistent with the testimony that [she] was severely intoxicated and experienced intermittent periods of unconsciousness." *Id.*

Similarly, here the state presented evidence from numerous witnesses regarding S.S.'s intoxication prior to the sexual encounter. S.S. then testified extensively about the details relating to the sexual encounter. She testified that she was "very intoxicated" when Williams arrived at her apartment and that she was in and out of consciousness throughout the sexual encounter. Because S.S. testified that she was intermittently "asleep or not conscious," her testimony is sufficient to sustain the jury's finding that she was physically helpless.[4] *See* Minn. Stat. § 609.341, subd. 9(a).

For this reason, the state's evidence established, beyond a reasonable doubt, that S.S. was physically helpless.

---

[4] Williams relies on *State v. Blevins*, 757 N.W.2d 698 (Minn. App. 2008), to support his argument that there is insufficient evidence to show that S.S. was physically helpless. But *Blevins* is distinguishable because it only addressed whether the complainant was "unable to withhold consent," not whether the complainant was "asleep or not conscious." 757 N.W.2d at 700; *see also* Minn. Stat. § 609.341, subd. 9.

## 2.     Knowledge

Williams argues that, even if the evidence was sufficient to prove S.S. was physically helpless, the state failed to prove that Williams knew or had reason to know that S.S. was physically helpless. According to Williams, the facts proved fail to eliminate the rational hypothesis that Williams did not know, or have reason to know, that S.S. was physically helpless, and therefore the state failed to prove beyond a reasonable doubt that Williams had the requisite mental state to commit the offense charged.

Under Minn. Stat. § 609.02, subd. 9(2) (2016), "know" means "the actor believes that the specified fact exists." As it was in this case, a defendant's mental state is "generally proven through circumstantial evidence." *See, e.g.*, *Al-Naseer*, 788 N.W.2d at 474 (quotation omitted). Thus, we apply the heightened two-step circumstantial-evidence test to evaluate whether sufficient evidence proved Williams knew or should have known that S.S. was physically helpless. *See Ortega*, 813 N.W.2d at 100.

Here, viewing the evidence in the light most favorable to the verdict, deferring "to the jury's acceptance of the proof of these circumstances," and assuming "that the jury believed the State's witnesses and disbelieved the defense witnesses," *see Silvernail*, 831 N.W.2d at 598-99, we identify the circumstances proved. The state proved: (1) Williams spent all evening with S.S., who showed obvious signs of heavy intoxication, including being "half carried" home; (2) throughout the evening, S.S. rejected Williams's advances and said that she was not going to sleep with him; (3) during the walk back to the apartment building, Williams told second friend that the two women, S.S. and first friend, were very drunk and the two men could do whatever they wanted; (4) both friends were worried about

12

what Williams might do, walked S.S. to her apartment, and made sure S.S. locked her door; (5) Williams later went to S.S.'s apartment, knocked on the door, and entered S.S.'s apartment after she opened the door; (6) S.S. told Williams she was not going to sleep with him; (7) S.S. changed her clothes and got into bed; (8) Williams asked S.S. questions as she drifted in and out of consciousness; (9) S.S. awoke when Williams rolled her onto her back and was afraid of Williams when he was on top of her; (10) S.S. repeatedly verbalized nonconsent and physically resisted Williams during the sexual encounter; and (11) S.S. slipped "in and out" of consciousness during the sexual encounter.

We next evaluate whether the circumstances, when viewed as a whole, are consistent with guilt and inconsistent with any rational hypothesis except for guilt. *See id.* at 599. Williams argues the circumstances proved fail to eliminate the rational hypothesis that Williams neither knew, nor should have known, that S.S. was physically helpless during the sexual encounter, because she was able to open the apartment door, put herself to bed, and was able to speak to Williams before and during the sexual encounter. We are not persuaded.

Again, our analysis is guided by *Berrios*. There, the state presented evidence that the complainant was extremely intoxicated and required assistance walking home. *Berrios*, 788 N.W.2d at 143. The complainant testified that "she passed out . . . after telling [Berrios] 'no' and was unconscious when he penetrated her." *Id.* We concluded that "[f]rom this testimony alone, there was ample evidence for the jury to conclude that Berrios knew or had reason to know that [the complainant] had been rendered physically helpless by her alcohol consumption." *Id.*

13

Here, similarly, the evidence proved that S.S. was highly intoxicated when she walked home with Williams and the two friends. Throughout the night, she rejected Williams's advances. And S.S. passed out, only to wake up during the sexual encounter. Further, direct evidence proved that S.S. was not conscious for portions of the encounter. During those times, S.S. was neither able to verbalize nonconsent nor able to physically resist Williams. In stark contrast, direct evidence proved S.S. verbalized nonconsent and physically resisted Williams while she was conscious. From this evidence, the only reasonable inference is that Williams knew, or should have known, that S.S. was unconscious during portions of the sexual encounter, because she would have ceased resisting Williams while she was unconscious. We therefore conclude that sufficient evidence supported the jury's finding that Williams knew or should have known S.S. was physically helpless.

### B.    Count Two—Minn. Stat. § 609.342, subd. 1(e)(i)

Williams next challenges whether the state presented sufficient evidence to sustain the jury's verdict on count two. Williams argues the state failed to prove beyond a reasonable doubt that he used either "force" or "coercion" to accomplish sexual penetration.[5] Again, we apply the direct-evidence test because the complainant's testimony on this element is direct evidence. *See, e.g.*, *Epps*, 949 N.W.2d at 487.

---

[5] Because we conclude there was sufficient evidence to support the jury's finding that Williams used force to accomplish sexual penetration, we do not reach the question of whether Williams used coercion.

14

Under Minn. Stat. § 609.342, subd. 1(e)(i), "[a] person who engages in sexual penetration with another person . . . is guilty of criminal sexual conduct in the first degree if . . . the actor causes personal injury to the complainant, and . . . the actor uses force or coercion to accomplish sexual penetration." Thus, to convict Williams, the state must prove: (1) Williams engaged in sexual penetration of S.S.; (2) Williams caused personal injury to S.S.; and (3) Williams used "force or coercion to accomplish sexual penetration." Minn. Stat. § 609.342, subd. 1(e)(i).[6] Under the statute,

> "[f]orce" means the infliction, attempted infliction, or threatened infliction by the actor of bodily harm or commission or threat of any other crime by the actor against the complainant or another, which (a) causes the complainant to reasonably believe that the actor has the present ability to execute the threat and (b) if the actor does not have a significant relationship to the complainant, also causes the complainant to submit.

Minn. Stat. § 609.341, subd. 3 (2016). And "'bodily harm' means physical pain or injury, illness, or any impairment of physical condition." Minn. Stat. § 609.02, subd. 7 (2016).

Williams argues the state failed to prove that he used force to accomplish sexual penetration because the state offered no evidence that Williams used the infliction or threatened infliction of bodily harm to "cause [S.S.] to submit" to the sexual encounter. *See* Minn. Stat. § 609.341, subd. 3. Williams's argument rests on a misreading of the definition of "force." Contrary to Williams's argument, "force" does not require the actor

---

[6] Williams does not contest that the state presented sufficient evidence on the first two elements.

to use the infliction of bodily harm to cause a victim to submit. Rather, the statute defines "force" disjunctively as:

> the infliction, attempted infliction, or threatened infliction by the actor of bodily harm *or* commission or threat of any other crime by the actor against the complainant or another, which (a) causes the complainant to reasonably believe that the actor has the present ability to execute the threat and (b) if the actor does not have a significant relationship to the complainant, also causes the complainant to submit.

*Id.* (emphasis added); *see also In re Marriage of Goldman*, 748 N.W.2d 279, 283 (Minn. 2008) ("[W]e normally interpret the conjunction 'or' as disjunctive.").

Reviewing the statute, an Oxford comma precedes the first "or," indicating that "the infliction, attempted infliction, or threatened infliction" of bodily harm is a list of three items. *See* The Chicago Manual of Style, § 6.19 (17th ed. 2017) ("When a conjunction joins the last two elements in a series of three or more, a comma—known as the serial or series comma or the Oxford comma—should appear before the conjunction.") The second "or," on the other hand, divides the first part of the definition from the second part. Consequently, only the second part of the definition requires the state to prove that conditions (a) and (b) were satisfied. In other words, the statute defines "force" to mean: (1) "the infliction . . . of bodily harm"; (2) the "attempted infliction . . . of bodily harm"; (3) the "threatened infliction . . . of bodily harm"; or (4) "commission or threat of any other crime . . . which (a) causes the complainant to reasonably believe that the actor has the present ability to execute the threat and (b) if the actor does not have a significant relationship to the complainant, also causes the complainant to submit." Thus, "force"

includes "the infliction . . . of bodily harm,"[7] and a jury need not find that the infliction of bodily harm caused the complainant to submit.[8]

Here, S.S.'s testimony was sufficient direct evidence to show that Williams used "force" to accomplish sexual penetration. Specifically, S.S. testified about feeling pain from the friction of Williams putting his penis in her vagina, describing it as "a jam-it-in sort of thing." S.S. also testified that Williams pulled her on top of him and that it hurt as he held her hips down while she tried to get off of him. Finally, S.S. testified that she remembered that it hurt when Williams tried to perform oral sex on her, he bit her thighs and vagina, and when she tried to push him away, he only became more aggressive. First friend corroborated this testimony by describing the bruising she observed on S.S.'s thighs. Therefore, the state presented direct evidence that Williams inflicted bodily harm on S.S., and this evidence proved Williams used force to accomplish sexual penetration.

We conclude sufficient evidence supported the jury's verdict on count two.

---

[7] In 2021, the legislature amended the definition of "force" to make it clear that the infliction of bodily harm is "force" under the statute. 2021 Minn. Laws 1st Spec. Sess. ch. 11, art. 4, § 6 at 2034 ("'Force' means either: (1) the infliction by the actor of bodily harm; or (2) . . . .") (codified at Minn. Stat. § 609.0341, subd. 3 (2022)).

[8] This statutory interpretation is consistent with Minnesota Supreme Court precedent, *see In re Welfare of D.L.K.*, 381 N.W.2d 435, 438 (Minn. 1986) ("In [prior] cases we have found the requirement of force satisfied when the actor inflicts bodily harm or pain or the threat thereof on another while accomplishing sexual contact." (citation omitted)), and our nonprecedential opinion in *State v. Bingham*, A20-0318, 2020 WL 7688680, at *3 (Minn. App. Dec. 28, 2020), *rev. denied* (Minn. Mar. 30, 2021).

**II.**

Williams alternatively argues that the district court erred when it convicted and sentenced him for two counts of first-degree criminal sexual conduct because both counts were based on the same conduct. We agree.

We review whether an offense is subject to multiple convictions de novo. *State v. Ferguson*, 808 N.W.2d 586, 590 (Minn. 2012). "Upon prosecution for a crime, the actor may be convicted of either the crime charged or an included offense, but not both." Minn. Stat. § 609.04, subd. 1 (2016). Minnesota appellate courts have consistently construed section 609.04 to bar multiple convictions for the same offense stemming from a single act. *See, e.g.*, *State v. Cruz*, 997 N.W.2d 537, 556 (Minn. 2023) (vacating, sua sponte, a duplicative second-degree intentional murder conviction when defendant was also convicted of first-degree felony murder stemming from a single killing); *State v. Holmes*, 778 N.W.2d 336, 340 (Minn. 2010) ("This statute 'generally forbids two convictions of the same offense . . . on the basis of the same conduct.'" (quoting *State v. Haase*, 341 N.W.2d 879, 881 (Minn. 1984))); *State v. Spears*, 560 N.W.2d 723, 726-27 (Minn. App. 1997) (vacating three of six convictions of first-degree criminal sexual conduct where convictions were based on three distinct acts), *rev. denied* (Minn. May 28, 1997). In fact, the Minnesota Supreme Court has explicitly applied section 609.04 to duplicative first-degree criminal-sexual-conduct convictions based on a single act. *See State v. Bowser*, 307 N.W.2d 778, 779 (Minn. 1981).

But the legislature has set forth certain exceptions to the prohibition in section 609.04. At issue here, the district court entered two convictions relying on Minn.

Stat. § 609.035, subd. 6 (2016).  Section 609.035, subdivision 6, states that "prosecution or conviction for committing a violation of sections 609.342 to 609.345 with force or violence is not a bar to conviction of or punishment for *any other crime* committed by the defendant as part of the same conduct."  (Emphasis added.)

Williams argues the district court erred when it relied on section 609.035, subdivision 6, to impose multiple convictions.[9]  The state disagrees, arguing that the words "with force or violence" found in subdivision 6 are critical, and that "any other crime," in this context, must mean any crime other "than criminal sexual conduct committed with force or violence."  Thus, the state argues, two convictions are authorized where, as here, the defendant is charged with one count of criminal sexual conduct committed with force or violence, and one count of criminal sexual conduct committed without force or violence.

We are not persuaded by the state's interpretation of subdivision 6.  Our decision in *State v. Nowels*, 941 N.W.2d 430 (Minn. App. 2020), *rev. denied* (Minn. June 16, 2020), is instructive.  In *Nowels*, the state charged defendant with first-degree aggravated robbery, possession of a firearm by an ineligible person, and possession of ammunition by an ineligible person, all resulting from the same incident.  *Id.* at 435.  Because Minn. Stat. § 609.035, subd. 3 (2016), authorizes multiple convictions and sentences when a defendant is convicted of possession of a firearm or ammunition and "any other crime," we were confronted with deciding "whether the 'any other crime' language removes the bar against

---

[9] Williams also challenges the district court's decision to impose two sentences, which the state argues subdivision 6 authorized.  Because we conclude the district court erred when it imposed two convictions, we do not reach the sentencing issue.

19

multiple convictions and sentences" and thereby authorized the district court to convict and sentence the defendant on all three charges. *Id.* at 441. We engaged in a careful analysis of our precedent, likening the case to *State v. Mitchell*, 881 N.W.2d 558 (Minn. App. 2016) and *State v. Patzold*, 917 N.W.2d 798 (Minn. App. 2018).

In *Mitchell*, we addressed the meaning of "any other crime" in the context of the burglary exception found in Minn. Stat. § 609.585 (2002). 881 N.W.2d at 564. The *Mitchell* court reasoned that "other" means "[d]ifferent from that or those implied or specified," and because burglary was the crime specified, "the only reasonable interpretation of 'any other crime' is a crime different from burglary." *Id.* (alteration in original).

In *Patzold*, we addressed whether Minn. Stat. § 609.035, subd. 6 (2016), the same exception we address here, authorized the district court to convict and sentence the defendant for one count of criminal sexual conduct committed with force or violence and two counts of domestic assault, when all three counts were based on the same conduct. 941 N.W.2d at 809-10. The *Patzold* court reasoned that although "the jury determined that one incident . . . constituted two different assault crimes," a defendant "may not be adjudicated and sentenced twice [for] the *same* offense." *Id.* at 809-11 (alteration in original) (quotation omitted). Thus, we concluded the defendant could only be sentenced for one of the domestic-assault charges, and the district court must vacate the other sentence. *Id.* at 812.

20

The *Nowels* court applied these two cases, explaining:

> In *Mitchell* and *Patzold*, the defendants were charged with two counts of the same crime, but each count was a different means of committing the same crime. Here, Nowels was also charged with two counts of the same crime—unlawful possession—but each count is a different means to commit the crime— possessing a firearm and possessing ammunition. And like *Patzold*, where we permitted punishment for both the domestic assault and sexual assault, Nowels may be convicted and punished for one unlawful-possession offense and aggravated robbery because aggravated robbery is "any other crime," under the firearms-offense exception. *See* Minn. Stat. §§ 609.035, subd. 3, .04. But he cannot be convicted and punished for two possession offenses under the *Mitchell* and *Patzold* analytical frameworks.

941 N.W.2d at 442-43 (footnote omitted).

This case is strikingly similar to *Nowels*. Here, the state charged Williams with two counts of the same crime—first-degree criminal sexual conduct—but each count was a different means of committing the crime—one with force and the other upon a physically helpless victim. We find no fault with the *Nowels* court's reasoning. Under our caselaw, Williams cannot be convicted and punished for two counts of the same crime stemming from the same conduct. "[A]ny other crime," as used in the context of subdivision 6, must mean a crime other than criminal sexual conduct. Accordingly, we reverse in part and remand to the district court with instructions to vacate one of Williams's convictions and the corresponding sentence.

## DECISION

For the reasons given above, we affirm the jury's verdict on both counts, but reverse in part and remand to the district court with instruction to vacate one of the convictions and corresponding sentence while leaving the guilty verdicts intact.

**Affirmed in part, reversed in part, and remanded.**